FILED
2008 Aug-07 PM 02:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

1
2
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
JASPER DIVISION

3  UNITED STATES OF AMERICA,        6:07-CR-157-RDP

4                                   APRIL 25, 2008
        V.
5                                   BIRMINGHAM, AL
PIERRE ERNEST FALGOUT,
6
        DEFENDANT.
7  * * * * * * * * * * * * *

8            TRANSCRIPT OF SENTENCING
     BEFORE THE HONORABLE R. DAVID PROCTOR
9          UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  FOR THE UNITED STATES:

12  MARY STUART BURRELL, AUSA
HUNTSVILLE, ALABAMA
13
FOR THE DEFENDANT:
14
GREGORY J. REID
15  GARDENDALE, ALABAMA

16  COURT REPORTER:

17  LINDY M. FULLER, RMR, CRR, CBC
FEDERAL OFFICIAL COURT REPORTER
18  BIRMINGHAM, ALABAMA  35203

19

20

21

22

23

24

25

Case 6:07-cv-00157-RDP-RRA   Document 40   Filed 08/07/08   Page 2 of 86

P R O C E E D I N G S

(IN OPEN COURT)

THE COURT:  WE ARE HERE IN UNITED STATES OF AMERICA V. PIERRE ERNEST FALGOUT, III, CASE NUMBER 6:07-CR-157-RDP-RRA.  WE ARE HERE FOR A SENTENCING HEARING.  ALL COUNSEL ARE PRESENT, AS IS THE DEFENDANT.

THE COURT, PRIOR TO THIS, HAS REVIEWED SOME OF THE EVIDENCE THE GOVERNMENT HAS OFFERED WITH THE CONSENT OF DEFENSE COUNSEL DOING THAT BEFORE THE HEARING SO IT DIDN'T HAVE TO TAKE PLACE DURING THE HEARING.

MR. REID, HAVE YOU AND YOUR CLIENT HAD THIRTY-FIVE DAYS IN WHICH TO REVIEW THE PRESENTENCE REPORT?

MR. REID:  WE HAVE YOUR HONOR.

THE COURT:  ARE THERE ANY OBJECTIONS TO ANY CONTENT OF THE REPORT?

MR. REID:  WE HAVE NOT FILED WRITTEN FORMAL OBJECTIONS.  WE HAVE FILED A MOTION FOR A VARIANCE BASED ON UNITED STATES V. BOOKER AND WE WOULD LIKE TO RESERVE THOSE ARGUMENTS FOR THE MITIGATION PHASE.

THE COURT:  ALL RIGHT, AND I WILL LET YOU DO THAT.  I WILL GO AHEAD AND MAKE THE APPROPRIATE FINDINGS THOUGH, IN LIGHT OF THE FACT THERE ARE NO OBJECTIONS THAT BEAR UPON THE GUIDELINE CALCULATIONS HERE.

IN COMPLIANCE WITH BOOKER, WHILE NOT BOUND TO APPLY THE GUIDELINES, I HAVE CONSULTED THEM AND TAKEN THEM

1  INTO ACCOUNT ON THE ISSUE THE APPROPRIATE RANGE OF

2  SENTENCE BE IMPOSED IN THIS CASE.  AND IN THAT REGARD, I

3  NOTE THAT THERE BEING NO OBJECTIONS, THE COURT ADOPTS THE

4  FACTUAL STATEMENTS CONTAINED IN THE PRESENTENCE REPORT,

5  MAKE SPECIFIC FINDINGS THE GUIDELINE OFFENSE LEVEL IS 43,

6  CRIMINAL HISTORY CATEGORY IS I, THE ADVISORY GUIDELINE

7  IMPRISONMENT RANGE TERM WOULD ORDINARILY BE LIFE; HOWEVER,

8  PURSUANT TO SENTENCING GUIDELINE SECTION 5G1.2D, THE

9  GUIDELINE TERM BECOMES 11,520 MONTHS OR 960 YEARS.

10          FURTHER, THE SUPERVISED RELEASE PERIOD IS NOT

11  LESS THAN FIVE YEARS, UP TO LIFE, AND THE FINE RANGE IS

12  $25,000 TO $250,000.  RESTITUTION IS AN ISSUE IN THE

13  CASE.  WE'LL NEED TO TAKE THAT UP DURING THE SENTENCING

14  HEARING.

15          LET'S SEE.  LET'S DISCUSS THE BEST WAY TO

16  PROCEED.  I THINK WHAT WE OUGHT TO HAVE IS THE GOVERNMENT

17  INTRODUCE THE EVIDENCE, BY AGREEMENT THE PARTIES,

18  INDICATED I COULD REVIEW IN ADVANCE OF THE HEARING THIS

19  MORNING.  I HAVE LOOKED AT THE PHOTOGRAPHS THAT I

20  UNDERSTAND THE GOVERNMENT'S GOING TO BE INTRODUCING THAT

21  WERE PART OF THE CHARGED CONDUCT.  I HAVE ALSO LOOKED AT

22  THE VIDEO CLIPS THAT WERE ABOUT THIRTY SOME-ODD MINUTES IN

23  LENGTH IN THEIR ENTIRETY.  BUT I WILL ALLOW THE GOVERNMENT

24  TO GO AHEAD AND INTRODUCE THESE  INITIALLY.

25          MS. BURRELL:  YOUR HONOR, AND I WILL JUST

Case 6:12-cv-00037-RDP-PHA Document 6-4 Filed 09/07/18 Page 4 of 87
Case 6:07-cv-00037-RDP-RRA Document 40 Filed 08/07/08 Page 4 of 86

4

1  INTRODUCE THOSE.  I WILL CALL LARRY CROCKER TO THE STAND

2  TO AUTHENTICATE THEM AND INTRODUCE THEM THAT WAY.

3          THE COURT:  ALL RIGHT.

4          GOVERNMENT WITNESS, LARRY CROCKER, SWORN

5          THE CLERK:  BE SEATED, PLEASE.  PLEASE STATE YOUR

6  NAME.

7              THE WITNESS:  LARRY CROCKER.

8              THE CLERK:  PLEASE SPELL YOUR NAME.

9              THE WITNESS:  L-A-R-R-Y, C-R-O-C-K-E-R.

10             THE CLERK:  IN WHAT CITY AND STATE DO YOU

11  RESIDE?

12             THE WITNESS:  HUNTSVILLE ALABAMA.

13         DIRECT EXAMINATION BY MS. BURRELL:

14    Q.  MR. CROCKER, HOW ARE YOU EMPLOYED?

15    A.  EMPLOYED WITH THE ALABAMA OFFICE OF PROSECUTION

16  SERVICES.

17    Q.  DO YOU DO ANYTHING IN PARTICULAR FOR THE ALABAMA

18  OFFICE OF PROSECUTION SERVICES?

19    A.  I DO COMPUTER FORENSICS.

20    Q.  OKAY.  WERE YOU INVOLVED IN THE CASE OF UNITED

21  STATES V. PIERRE FALGOUT?

22    A.  YES, MA'AM, I WAS.

23    Q.  AND HOW DID YOU BECOME INVOLVED IN THAT

24  INVESTIGATION?

25    A.  I WAS CONTACTED BY THE LAMAR COUNTY SHERIFF'S

Case 6:07-cv-00037-RDP-PHA   Document 44   Filed 08/07/08   Page 5 of 86

1   DEPARTMENT TO ASSIST IN THE INVESTIGATION ON THE

2   ELECTRONIC CRIMES PART OF IT.

3        Q.   OKAY.  AND DID YOU ASSISTANT IN RECOVERING

4   ELECTRONIC EVIDENCE FROM THIS CASE?

5        A.   YES, MA'AM, I DID.

6        Q.   AND HAVE YOU HAD AN OCCASION TO LOOK AT THAT

7   EVIDENCE?

8        A.   YES, MA'AM, I HAVE.

9        Q.   OKAY.  I AM GOING TO SHOW YOU, LARRY, WHAT'S BEEN

10  PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 1 THROUGH 30 AND

11  GOVERNMENT'S EXHIBIT 43 AND ASK YOU TO LOOK THROUGH THESE

12  PICTURES.  AND, LARRY, IF YOU WILL LOOK THROUGH --

13  MR. CROCKER, IF YOU WILL LOOK THROUGH EACH ONE AND MAKE

14  SURE THAT YOU RECOGNIZE EACH ONE OF THOSE PHOTOGRAPHS.

15             DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

16       A.   YES, MA'AM, I DO.

17       Q.   AND WHERE DID THOSE PHOTOGRAPHS COME FROM?

18       A.   THESE PHOTOGRAPHS CAME FROM SONY MEMORY STICKS

19  FROM THE RESULTS OF A COMPUTER EXAM.

20       Q.   OKAY.  AND DO YOU KNOW WHERE THE SONY MEMORY

21  STICK CAME FROM?

22       A.   YES, MA'AM.  THEY CAME FROM, THERE WAS A BLACK

23  BAG THAT WAS SUBMITTED TO ME AS EVIDENCE.  IN THE BOTTOM

24  OF THE BLACK BAG WERE THE TWO MEMORY STICKS.

25       Q.   DO YOU KNOW WHERE THE BAG THAT THE SONY MEMORY

Case 6:12-cv-00037-RDP-PHA   Document 64   Filed 08/07/13   Page 6 of 87
Case 6:12-cv-00037-RDP-PHA   Document 46   Filed 08/07/08   Page 6 of 86

6

1   STICK CAME FROM, DO YOU KNOW WHOSE RESIDENCE IT WAS

2   RECOVERED FROM?

3        A.   PIERRE FALGOUT.

4        Q.   DO THOSE PICTURES FAIRLY AND ACCURATELY DEPICT

5   THE IMAGES THAT WERE RECOVERED FROM THE SONY MEMORY

6   STICKS?

7        A.   YES, MA'AM.

8             MS. BURRELL:  YOUR HONOR, WE WOULD OFFER

9   THOSE EXHIBITS, GOVERNMENT'S EXHIBIT 1 THROUGH 30 AND 43

10  INTO EVIDENCE.

11            MR. REID:  NO OBJECTION.

12            THE COURT:  WITHOUT OBJECTION, THEY ARE RECEIVED.

13       Q.   MR. CROCKER, LET ME ALSO SHOW YOU WHAT'S BEEN

14  PREVIOUSLY MARKED GOVERNMENT'S EXHIBIT 44 AND I WILL ASK

15  YOU IF YOU RECOGNIZE THAT PLAINTIFF'S EXHIBIT.

16       A.   I DO.

17       Q.   AND WHAT DOES THAT APPEAR TO BE?

18       A.   THIS IS A DVD THAT WAS THE RESULTS OF AN 8MM TAPE

19  THAT WAS CONVERTED TO DVD.

20       Q.   IT WAS AN 8MM TAPE THAT WAS CONVERTED TO DVD

21  FORMAT; IS THAT CORRECT?

22       A.   THAT'S CORRECT.

23       Q.   WHERE DID THE 8MM TAPE COME FROM?

24       A.   IT CAME FROM WITHIN THE SAME BLACK BAG WITH THE

25  CAMERA THAT WAS SUBMITTED TO ME INTO EVIDENCE.

Case 6:12-cv-00037-RDP-RRA Document 64 Filed 08/07/13 Page 7 of 87
Case 6:12-cv-00037-RDP-RRA Document 64 Filed 08/07/13 Page 7 of 86

7

1    Q.   AND IT'S THE SAME BLACK BAG THAT WAS RECOVERED

2  FROM PIERRE FALGOUT'S RESIDENCE?

3    A.   THAT'S CORRECT.

4    Q.   WHO CONVERTED THE 8MM TAPE TO DVD FORM?

5    A.   I DID.

6    Q.   AND HAVE YOU HAD A CHANCE TO REVIEW THAT DVD?

7    A.   I HAVE.

8    Q.   AND DOES IT FAIRLY AND ACCURATELY OR IS IT AN

9  EXACT COPY OF THE 8MM TAPE THAT WAS RECOVERED FROM THE

10 BLACK BAG FROM PIERRE FALGOUT'S RESIDENCE?

11   A.   YES, MA'AM.

12        MS. BURRELL:  YOUR HONOR, WE WOULD OFFER

13 INTO EVIDENCE GOVERNMENT'S EXHIBIT 44.

14        MR. REID:  NO OBJECTION.

15        THE COURT:  WITHOUT OBJECTION, THAT'S RECEIVED.

16        MS. BURRELL:  THAT'S ALL WE HAVE OF THE

17 WITNESS, YOUR HONOR.

18        THE COURT:  ANY CROSS EXAMINATION?

19        MR. REID:  NONE YOUR HONOR.

20        THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

21        ALL RIGHT.  DOES THE GOVERNMENT WISH TO INTRODUCE

22 ANY ADDITIONAL EVIDENCE?

23        MS. BURRELL:  YOUR HONOR, THE ONLY OTHER

24 ADDITIONAL EVIDENCE THAT WE WOULD INTRODUCE WOULD BE

25 GOVERNMENT'S EXHIBIT 49, AND THIS IS JUST A VICTIM IMPACT

1  LETTER FROM BEN ALLEN AND KATHY ALLEN, ONE OF THE CHILD'S

2  PARENTS.

3          THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT

4  BEING INTRODUCED AT THIS POINT OR WOULD YOU WANT IT

5  AUTHENTICATED?

6          AGAIN, I AM NOT SURE IT'S EVIDENCE AS MUCH AS

7  JUST SOMETHING I NEED TO CONSIDER FOR PURPOSES OF

8  SENTENCING AS FAR AS IMPACT ON VICTIMS.

9              MR. REID:  WE WOULD OBJECT, I GUESS, ON

10 AUTHENTICATION YOUR HONOR, AND RESERVE THE RIGHT TO

11 ADDRESS IT.

12         THE COURT:  ALL RIGHT.  DO YOU WANT TO SUBMIT IT

13 AS AN EVIDENTIARY MATTER OF RECORD OR AS PART OF THE

14 GOVERNMENT'S POSITION AND ARGUMENT ON IMPACT?

15         MS. BURRELL:  YOUR HONOR, THIS IS NOT REALLY

16 EVIDENCE.  THIS IS A VICTIM IMPACT STATEMENT AND CERTAINLY

17 THEY ARE ENTITLED TO WRITE LETTERS TO THE COURT.

18         THE COURT:  THAT'S WHAT I AM SAYING.  I TAKE IT

19 YOU WOULD RATHER INTRODUCE IT AS THAT RATHER THAN REALLY

20 AS A MATTER OF EVIDENCE REGARDING EVIDENTIARY RECORD

21 MATTERS.

22             MS. BURRELL:  RIGHT.  IT'S NOT EVIDENCE,

23 YOUR HONOR.

24         THE COURT:  ALL RIGHT.  I WILL RECEIVE IT FOR

25 THAT LIMITED PURPOSE THEN.

1    MS. BURRELL:  OKAY.  MAY I APPROACH?

2         THE COURT:  I GUESS I WAS UNDER THE

3  IMPRESSION THE GOVERNMENT WAS GOING TO INTRODUCE SOME

4  MEDICAL RECORDS, TOO, OR MATTERS RELEVANT TO TREATMENT OF

5  ONE OF THE, ONE OR MORE OF THE ALLEGED VICTIMS OR VICTIM.

6         MS. BURRELL:  NO, YOUR HONOR.

7    THE COURT:  ALL RIGHT.  I TAKE IT THE

8  DEFENDANT -- IS THERE ANYTHING FURTHER THE GOVERNMENT

9  WANTS TO INTRODUCE AT THIS TIME?

10        MS. BURRELL:  NOT AT THIS TIME, YOUR HONOR.

11         THE COURT:  ALL RIGHT.  MR. REID, I TAKE IT

12  YOU HAVE SOME MATTERS YOU WOULD LIKE TO PRESENT TO THE

13  COURT BY WAY OF EVIDENCE?

14         MR. REID:  YES, YOUR HONOR.  WE HAVE SEVERAL

15  PEOPLE WHO ARE HERE THAT WOULD OFFER STATEMENTS, I GUESS,

16  TO THE EQUIVALENT OF VICTIM IMPACT STATEMENTS.  WOULD YOU

17  LIKE US TO DO THAT?

18         THE COURT:  YEAH.  ANYTHING THAT'S RELATED TO

19  THAT WE CAN DO WHEN WE GET TO YOUR OPPORTUNITY TO SPEAK TO

20  THE COURT IN MITIGATION OR OTHERWISE IS WHAT I AM

21  THINKING.  WHAT I AM INTERESTED NOW IN RECEIVING IS JUST

22  MAKING SURE THE EVIDENTIARY RECORD IS COMPLETE.

23         MR. REID:  WE HAVE DR. FRANKIE PRESTON THAT WOULD

24  OFFER EVIDENCE, AND SO WE CALL HIM AT THIS TIME.

25         THE COURT:  ALL RIGHT.  IF YOU ARE READY TO DO

Case 6:12-cv-09037-RDP-NHE   Document 44   Filed 09/17/03   Page 10 of 87
Case 6:12-cv-09037-RDP-PRA   Document 40   Filed 09/17/08   Page 10 of 86

10

```
 1   THAT, YOU MAY.
 2            DEFENSE WITNESS, DR. FRANKIE PRESTON, SWORN
 3                    THE CLERK:  BE SEATED PLEASE.  PLEASE STATE
 4   YOUR NAME.
 5                    THE WITNESS:  MY NAME IS FRANKIE L.
 6   PRESTON.
 7                    THE CLERK:  SPELL YOUR NAME.
 8                    THE WITNESS:  F-R-A-N-K-I-E, L.,
 9   P-R-E-S-T-O-N.
10                    THE CLERK:  IN WHAT CITY AND STATE DO YOU
11   RESIDE?
12                    THE WITNESS:  HUNTSVILLE, ALABAMA.
13            DIRECT EXAMINATION BY MR. REID:
14            THE COURT:  ALL RIGHT.  MR. REID, YOU MAY PROCEED
15   WHEN YOU ARE READY.
16       Q.  DR. PRESTON, WHEN YOU ARE READY.
17       A.  I AM PREPARED.
18       Q.  DR. PRESTON, HOW ARE YOU EMPLOYED?
19       A.  I AM EMPLOYED IN PRIVATE PRACTICE AS A CLINICAL
20   PSYCHOLOGIST, MARRIAGE AND FAMILY THERAPIST AND LICENSED
21   COUNSELOR.
22       Q.  AND HAVE YOU RECEIVED ANY SPECIAL TRAINING AND
23   EDUCATION TO QUALIFY YOU FOR THAT POSITION?
24       A.  YES, SIR.
25       Q.  AND HOW LONG HAVE YOU BEEN DOING THAT?
```

1    A.   I ACTUALLY HAVE BEEN WORKING IN THE MENTAL HEALTH

2  FIELD SINCE 1975.  BUT CREDENTIALED SINCE 19 -- 1977.

3              MR. REID:  YOUR HONOR, WE HAVE PREVIOUSLY

4  PROVIDED THE CURRICULUM VITAE TO THE DEFENDANT.  WE WOULD

5  OFFER COPIES FOR THE COURT'S CONSIDERATION.

6              THE COURT:  ALL RIGHT.  ANY OBJECTION?

7              MS. BURRELL:  NO.

8              THE COURT:  WITHOUT OBJECTION, IT IS RECEIVED.

9  AND WE ARE GOING TO MARK THESE FOR IDENTIFICATION AS

10  DEFENDANT'S EXHIBITS ONE AND TWO, DEFENDANT'S EXHIBIT ONE

11  IS THE CURRICULUM VITAE FOR FRANKIE L. PRESTON AND

12  DEFENDANT'S EXHIBIT TWO IS A CONTINUING EDUCATION HISTORY

13  FOR MR. PRESTON, DR. PRESTON.

14              MR. REID:  AT THIS TIME, YOUR HONOR, WE WOULD

15  LIKE COURT TO RECOGNIZE DR. PRESTON AS AN EXPERT IN THE

16  FIELD.

17              THE COURT:  ANY OBJECTION?

18              MS. BURRELL:  NO, WE DON'T OBJECT TO THAT, YOUR

19  HONOR.

20              THE COURT:  I WILL MAKE THAT FINDING BASED UPON

21  THE PARTIES' AGREEMENT.

22    Q.   DOCTOR --

23              THE COURT:  ALSO, I WILL SAY BASED UPON ALSO THE

24  CURRICULUM VITAE THAT I HAVE REVIEWED AS GOVERNMENT'S

25  EXHIBIT -- DEFENDANT'S 1.

1    MR. REID:

2    Q.  DR. PRESTON, HAVE YOU HAD AN OCCASION TO MEET

3    PIERRE FALGOUT?

4    A.  I HAVE.

5    Q.  AND CAN YOU DESCRIBE FOR US THE SUBSTANCE OF THAT

6    MEETING AND WHAT OCCURRED?

7    A.  YES.  I TRAVELED TO CALERA, ALABAMA, AND MET WITH

8    HIM IN THE COUNTY JAIL ON NOVEMBER 16TH AND 17TH OF 2007.

9    Q.  AND WHAT DID YOU DO DURING THAT MEETING?

10   A.  I SPENT APPROXIMATELY SEVEN HOURS TALKING TO HIM

11   VIA INTERVIEW TO TALK WITH HIM ABOUT HIS FORMATIVE YEARS

12   AND THE DIFFICULTIES HE HAD EXPERIENCED THAT LED TO THE

13   TREATMENT OF HIS DEPRESSION, HIS SUBSTANCE ABUSE PROBLEM,

14   AND THE ISSUES THAT SURROUNDED HIS ARREST AND GUILTY PLEA

15   IN THIS COURT.

16   Q.  AND AS A PART OF THAT INTERVIEW AND ANALYSIS, DID

17   YOU PERFORM ANY TESTS UPON HIM?

18   A.  YES, SIR, I DID.

19   Q.  WHAT TESTS DID YOU PERFORM?

20   A.  I ADMINISTERED TO HIM THE WIDE RANGE ACHIEVEMENT

21   TEST, THE GENERAL ABILITY MEASURE FOR ADULTS, THE

22   MINNESOTA MULTIPHASIC PERSONALITY INVENTORY USING CRIMINAL

23   NORMS.  I ADMINISTERED THE VALIDITY INDICATOR PROFILE, THE

24   SUBSTANCE ABUSE SUBTLE SCREENING INVENTORY, THE

25   MULTIPHASIC SEX INVENTORY, THE CLARK SEX HISTORY

1  QUESTIONNAIRE FOR MALES REVISED EDITION, AND THE SEXUAL

2  ABUSE INVENTORY.

3      Q.  AND DID YOU GAIN RESULTS FROM EACH OF THOSE TESTS

4  ADMINISTERED?

5      A.  I DID.

6      Q.  WERE YOU ABLE TO REVIEW ANY OF HIS PAST MENTAL

7  HEALTH RECORDS?

8      A.  YES, SIR, I DID.

9      Q.  WHAT ABOUT PAST WORK RECORDS?

10      A.  I HAVE REVIEWED THOSE AS WELL.

11      Q.  FROM ALL OF YOUR ANALYSES AND FROM YOUR TESTING

12  THAT YOU DID PERSONALLY AND FROM THE REVIEW OF RECORDS

13  BASED ON HIS HISTORY, WERE YOU ABLE TO MAKE A VALID

14  ASSESSMENT AND ANALYSIS OF MR. FALGOUT?

15      A.  I BELIEVE SO.

16      Q.  CAN YOU GIVE US IN YOUR WORDS SOME OF THE

17  FINDINGS OF THOSE ASSESSMENTS?

18      A.  YES, SIR.  HISTORY HAD INDICATED THAT HE HAD

19  GROWN UP IN PENSACOLA, FLORIDA, RAISED BY HIS NATURAL

20  PARENTS.  TWO SIBLINGS.  WENT TO PUBLIC SCHOOL.  NOTHING

21  SIGNIFICANT IN TERMS OF HIS BEHAVIOR OR ANY BEHAVIOR

22  PROBLEMS DURING HIS FORMATIVE YEARS.  GRADUATED FROM HIGH

23  SCHOOL.  AND MEANWHILE, HIS FATHER MOVED TO ALABAMA,

24  TRANSFERRED FROM THE RAILROAD THAT HE -- RAILROAD THAT HE

25  WORKED FOR.

1    MR. FALGOUT STAYED IN PENSACOLA BECAUSE HE

2 WANTED TO FINISH HIS HIGH SCHOOL THERE, HE HAD A HIGH

3 SCHOOL SWEETHEART AND HE WAS WORKING AT SOME STEREO

4 INSTALLATION COMPANY.  EVENTUALLY, THIS GIRLFRIEND BROKE

5 UP WITH HIM, WAS APPARENTLY OR ALLEGEDLY UNFAITHFUL, AND

6 THE STEREO STORE MOVED A BRANCH UP INTO ALABAMA AND HE

7 CAME TO ALABAMA WITH THAT PARTICULAR, THE OWNER OF THE

8 STORE.

9    AT THAT POINT, THERE HAD BEEN NO SERIOUS LEGAL

10 MENTAL HEALTH, SOCIAL PROBLEMS.  HE STARTED EVENTUALLY

11 WORKING IN THE MANUFACTURING BUSINESS WHERE THE COMPANY

12 MAKES TRASH CRUSHERS OR GARBAGE CRUSHERS.  AND NEAR THAT

13 TIME, AND AFTER SEVERAL FAILED RELATIONSHIPS WITH

14 GIRLFRIENDS, HE HAD STARTED EXPERIENCING SOME DEPRESSION.

15 HE HAD SOME SPORADIC SUBSTANCE ABUSE PRIOR TO THAT, BUT

16 EVENTUALLY THE DEPRESSION GOT TO THE POINT THAT HE WAS

17 ADMITTED TO A PSYCHIATRIC FACILITY, BAPTIST MEDICAL

18 CENTER, WHERE HE WAS, WHERE HE STAYED FOR SEVEN DAYS. DR.

19 BENTLEY TREATED HIM, DIAGNOSING HIM WITH MAJOR DEPRESSION,

20 AND HE TOOK SEVERAL MEDICATIONS, CYMBALTA, RESPIRADOL AND

21 VISTARIL FOR THOSE SYMPTOMS.

22    SIMULTANEOUS TO THAT OR PROXIMATE TO THAT, HE

23 HAD, HE WENT ON MEDICAL LEAVE FOR, AT THE MARATHON

24 EQUIPMENT COMPANY FOR ABOUT ONE MONTH AND CONTINUED WITH

25 OUTPATIENT TREATMENT.

1      EVENTUALLY, BECAUSE OF MISSING WORK AND NOT BEING

2   ABLE TO GO TO WORK, I UNDERSTAND THAT THERE WAS A SHIFT

3   CHANGE.  THE NIGHT SHIFT WAS SHUT DOWN AND HE WAS

4   TRANSFERRED TO THE DAY SHIFT.  HE REPORTS THAT HE COULD

5   NOT ADJUST TO THAT SHIFT SINCE HE HAD BEEN WORKING SO MANY

6   YEARS IN THAT CAPACITY.  AND HE HAD STARTED USING ICE,

7   WHICH IS A TYPE OF METHAMPHETAMINE, EXCEPT IT'S MUCH MORE

8   POWERFUL, CONCENTRATED.  THAT WAS INTRODUCED TO HIM BY ONE

9   OF HIS WORK SUPERVISORS TO HELP HIM KIND OF BE MORE

10  PRODUCTIVE AND STIMULATED.

11      HE LOST FROM APPROXIMATELY 170 TO 130 POUNDS.

12  NOTES THAT HE WAS BEING PARANOID, HE EVEN PUT UP SOME

13  CAMERAS IN HIS HOME.  AND HE ACTUALLY BEGAN MANUFACTURING

14  METHAMPHETAMINE FOR HIS OWN USE.

15      HE WAS FIRED FROM HIS WORK AND THEREFORE

16  DISCONTINUED THE OUTPATIENT TREATMENT.  HE WENT BANKRUPT,

17  DISTANCED HIMSELF FROM HIS FAMILY, THAT'S ALSO ACCORDING

18  TO COLLATERALS SUCH AS HIS MOTHER AND FATHER, AND HE

19  CONTINUED TO ESCALATE WITH HIS METHAMPHETAMINE USAGE.

20      AND BASICALLY, HE WAS UNDER, HAD BEEN ARRESTED

21  FOR, UNDER INVESTIGATION FOR METHAMPHETAMINE PRODUCTION AT

22  ONE POINT.

23      IN TERMS OF THE GENERAL TEST FINDINGS, TEST

24  RESULTS, WE FIRST START TO ESTABLISH THAT HE CAN READ AND

25  COMPREHEND AT A REASONABLE LEVEL AND THAT'S WHY I USED THE

1  WIDE RANGE ACHIEVEMENT TEST INDICATING THAT HE WAS READING

2  AT A FIFTH GRADE LEVEL, WHICH HE HAD PRIOR HAD SOME

3  DIFFICULTIES WITH LEARNING DISABILITY IN PUBLIC SCHOOL AND

4  ATTENDED SOME SPECIAL CLASSES FOR THAT.

5        HOWEVER, HIS IQ SCREENING INDICATED THAT HE HAD

6  AN IQ OF 109, SO WE PROCEEDED TO GIVE HIM VARIOUS TESTS.

7  THE MINNESOTA MULTIPHASIC PERSONALITY INVENTORY, MMPI-II,

8  WAS A VALID TEST.  IT CONFIRMED THAT HE WAS SUFFERING FROM

9  DEPRESSION, HE WAS BEING TREATED IN THE JAIL FOR

10 DEPRESSION.

11       MENTAL STATUS -- APPEARANCE WAS WITHIN NORMAL

12 LIMITS.  HE DIDN'T SEEM TO HAVE ANY KIND OF PSYCHOTIC

13 SYMPTOMS OR ANYTHING ABNORMAL IN TERMS OF ELEVATED MOOD.

14 HE WAS SOMEWHAT SEDATE BECAUSE, I BELIEVE IT WAS PROBABLY

15 BECAUSE OF THE MEDICATION.

16       WE ADMINISTERED A TEST CALLED THE VALIDITY

17 INDICATOR PROFILE, AND THIS ESSENTIALLY IS A TEST FOR A

18 TEST, MEANING THAT WE WANT TO SEE IF A PERSON IS GENERALLY

19 GOING TO GIVE VALID RESPONSES TO OTHER TESTS THAT WE MIGHT

20 USE, EVEN THOUGH SOME OF THE INDIVIDUAL TESTS HAVE THEIR

21 OWN VALIDITY INDICES.  THE V.I.P. ESSENTIALLY SAID THAT

22 HIS APPROACH TO THE ASSESSMENT WAS VALID, SO WE CAN PUT

23 SOME PRETTY GOOD STOCK IN THE OTHER TESTS.

24       WE ADMINISTERED THE SUBTLE ABUSE SUBSTANCE

25 SCREENING INVENTORY TWO TIMES.  THE REASON FOR THIS IS

1  BECAUSE WE WANT TO KNOW HIS PROBABILITY OF HAVING A

2  SUBSTANCE ABUSE PROBLEM FROM THE TIME OF HIS BIRTH UNTIL

3  2004 WHEN HE WAS ARRESTED OR, BEFORE HE WAS ARRESTED AND

4  THEN THE SIX MONTHS PRIOR TO HIS ARREST.  RESULTS SHOWED

5  THERE THAT HE HAD A LOW PROBABILITY OF SUBSTANCE ABUSE,

6  SUBSTANCE DEPENDENCE DISORDER IN THE FORMATIVE YEARS.

7  HOWEVER, SIX MONTHS PRIOR TO HIS ARREST, HE HAD A HIGH

8  PROBABILITY OF HAVING SUBSTANCE DEPENDENCE DISORDER.  THEN

9  WE MOVED ON TO THE SEXUAL INVENTORIES WHICH SHOWED THAT HE

10 HAD HAD SOME SUICIDAL THINKING, DEPRESSED MOOD AND HAD

11 ADMITTED TO BEING COMMITTED TO A MENTAL HOSPITAL AT ONE

12 POINT.  AND IT SHOWS THAT DRUG ABUSE HAS BEEN A PROBLEM

13 FOR HIM THAT CURRENTLY AFFECTS HIS BEHAVIOR, THOUGHTS AND

14 FEELINGS.

15       A GENERAL ASSESSMENT OF HIS SEXUAL HISTORY SAID

16 THAT HE HAS AN ACCURATE KNOWLEDGE OF HUMAN ANATOMY,

17 PHYSIOLOGY, PRESENTS HIMSELF AS HAVING BASIC LIBIDO URGES,

18 DRIVES, AGE APPROPRIATE SEXUAL INTEREST, NON-IMPAIRED

19 ERECTILE FUNCTIONING AND ADEQUATE SEXUAL PERFORMANCE.  HE

20 DOES NOT REPORT PARAPHILIA INTERESTS OR BEHAVIORS

21 INVOLVING FEMALE APPAREL, BONDAGE, DISCIPLINE, INFLICTING

22 SEXUAL HUMILIATION OR PAIN ON OTHERS, SEXUAL MASOCHISM OR

23 ANY OTHER FETISHES.  DOES NOT INDICATE THAT HE HAS EVER

24 BEEN SEXUALLY OBSESSED OR COMPULSIVELY DRIVEN AND

25 INDICATES THAT HE HAS ALWAYS KNOWN THAT IT WAS EITHER

1  WRONG, THAT IT WAS WRONG TO FORCE SOMEONE TO HAVE SEX OR

2  TO ENGAGE A MINOR IN SEX.

3         THE MSI-II, THIS PARTICULAR TEST IS A TEST THAT I

4  ADMINISTER AND SEND TO DOCTOR H.R NICHOLS IN TACOMA,

5  WASHINGTON.  HE ACTUALLY SCORES THE TEST AND INTERPRETS

6  THE TEST SO THAT WE HAVE SOME BLIND MEASURES THAT CAN'T BE

7  EASILY MANIPULATED BY THE ATTENDING CLINICIAN.  HE DENIES

8  HAVING FANTASIES INVOLVING AROUSAL FOR CHILDREN, DENIES

9  BEING IN POSSESSION OF DEVIANT PORNOGRAPHY, HAS RESPONDED

10  THAT HE ADMITS -- "I NOT ONLY ADMIT THAT I COMMITTED A SEX

11  OFFENSE BUT AT THE TIME I WAS DOING IT I TRIED TO STOP BUT

12  COULD NOT."

13         HE STATES "MY SEXUAL OFFENSE HAPPENED BECAUSE OF

14  PROBLEMS IN MY FAMILY.  MY SEXUAL OFFENSE HAPPENED BECAUSE

15  I DID NOT KNOW THAT WHAT I WAS DOING WAS WRONG."  HE SAYS

16  THAT HE WAS SAD AND DEPRESSED AND THE SEX PLAY WITH THE

17  PERSON WHO ACCUSED ME JUST HAPPENED DURING THOSE TIMES,

18  AND I HAD BEEN UNDER A LOT OF STRESS AND SEX PLAY WITH THE

19  PERSON WHO ACCUSED ME HAD JUST HAPPENED.

20         HE ALSO DISCUSSED WITH ME WHEN I TALKED WITH HIM

21  ABOUT THOSE SPECIFIC ITEM ENDORSEMENTS THAT VERY OFTEN

22  WHILE UNDER THE INFLUENCE HE EXPERIENCED SOME BLACKOUTS.

23  HE DIDN'T HAVE AN ACCURATE RECOLLECTION OR MEMORY WHICH IS

24  NOT UNCOMMON WITH THE USE OF METHAMPHETAMINE.  AND THAT HE

25  COULDN'T RECALL PORTIONS OR GREAT NUMBER OF THE INCIDENCES

1 THAT HE HAD BEEN ARRESTED FOR.

2          THE CLARK SEX HISTORY QUESTIONNAIRE IS DESIGNED

3 TO AID IN THE TREATMENT OF SEX OFFENDERS AND HERE HE

4 APPROACHED THE TEST CANDIDLY AND HAD A GREATER THAN

5 AVERAGE, SAYS THAT HE HAS A, HAS GREATER THAN AVERAGE

6 SEXUAL EXPERIENCES ADULT FEMALES, REPORTS HAVING DATED,

7 KISSED, ENGAGED IN GENITAL TOUCHING AND INTERCOURSE WITH

8 36 OR MORE ADULT FEMALES, AND 36 IS THE CEILING OF THE

9 TEST.  SO IT'S 36 OR MORE, SO THAT'S AS HIGH AS THE TEST

10 ACTUALLY RATES.

11          IT GOES ON TO EXPLAIN HIS SEXUAL ACTIVITIES,

12 ADULT FEMALES, AND OBTAINED A HIGH PERCENTILE ON THE

13 VOYERISM SCORE AS COMPARED TO OTHER SEX OFFENDERS.  AND,

14 OF COURSE, VOYERISM INVOLVES THE ACT OF OBSERVING

15 UNSUSPECTING INDIVIDUALS, USUALLY STRANGERS WHO ARE NAKED,

16 IN THE PROCESS OF DISROBING OR ENGAGING IN SEXUAL

17 ACTIVITY.

18          IF THERE IS AN ABSENCE OF EVIDENCE OR HISTORY OF

19 VOYERISM AS WE COMMONLY THINK ABOUT IT, THE TYPICAL

20 PEEPING TOM, THEN WHAT WE NORMALLY SEE IS THAT THERE IS A

21 HIGHLY VISUAL PERSON THAT LIKES TO VIEW, HAS VIEWED, MIGHT

22 EVEN CREATE SEXUAL MATERIALS AND SO FORTH.  HE WAS ALSO

23 INVOLVED WITH A WOMAN AT ONE POINT THAT WANTED TO HAVE

24 SEXUAL RELATIONS WITH OTHER MEN WHILE HE WATCHED.  AND SO

25 HE, OF COURSE, SAYS THAT THAT WAS NOT REALLY HIS INTEREST

1  BUT HE DID THAT TO PLEASE HER.  AND THE FACT THAT HE

2  PARTICIPATED IN THAT PROBABLY ELEVATES HIS VOYEURISTIC

3  SCALE.

4          SEXUAL ABUSE INVENTORY APPEARED OPEN,

5  NON-DEFENSIVE, TRUTHFUL.  RESPONSES ON THE CHILD MOLEST

6  SCALE, SEXUAL ASSAULT SCALE, INCEST SCALE, EXHIBITION

7  SCALE ARE IN THE LOW RISK RANGE.  AND SCORES ON THE DRUG

8  SCALE INDICATES THERE IS A SEVERE PROBLEM, 90 TO 100TH

9  PERCENTILE RANGE.  AND THE STRESS SCALE ALSO IS ELEVATED,

10 WHICH INCLUDED ANXIETY AND DEPRESSION.  THAT'S IN ABOUT

11 THE 70, THAT'S IN THE 70 TO 89TH PERCENTILE.

12         I ALSO COMPLETED THE HARE PSYCHIATRIC PATHOLOGY

13 CHECKLIST, REVISED SECOND EDITION, AND THIS TEST IS

14 DESIGNED TO DETERMINE IF A PERSON HAS PSYCHOPATHIC

15 TENDENCIES.  PEOPLE THAT WE SEE VERY OFTEN IN CRIMINAL

16 ASSESSMENTS HAVE PROTRACTED HISTORIES OF MISBEHAVIOR,

17 VIOLENCE, BREAKING THE LAW AND ALL KINDS OF AREAS.  AND

18 WHAT WE SEE HERE IS THAT HE SEEMED TO HAVE FAIRLY GOOD

19 ADJUSTMENT IN LIFE UNTIL HE STARTED USING THE

20 METHAMPHETAMINE AND WOULD NOT QUALIFY AS THE TYPICAL

21 PROFILE FOR A PSYCHIATRIC PATH.

22         THE GENERAL OVERALL CONCLUSIONS WAS THAT HERE IS

23 A GUY THAT HAD A FAIRLY UNREMARKABLE CHILDHOOD,

24 ADOLESCENCE AND EARLY ADULTHOOD.  HAD SOME STRESSORS IN

25 LIFE, ESPECIALLY ADULT FEMALES.  EXPERIENCED DEPRESSION,

1  WHICH IS SOMETHING THAT APPARENTLY RUNS IN HIS FAMILY, HIS

2  MOTHER HAVING BEEN HOSPITALIZED THREE TIMES, MAKING A

3  SUICIDE ATTEMPT ONE TIME.  SOME OTHER RELATIVES, AN AUNT

4  AND A COUSIN ALSO.

5          HE HAD WON LIKE THE EMPLOYEE OF THE YEAR AT THE

6  MARATHON COMPANY, AND THEN THE SHIFT CHANGE OCCURRED AND

7  HE GOES INTO DEPRESSION AND STARTS MEDICATIONS,

8  PSYCHIATRIC TREATMENT AND THEN GETS INTRODUCED TO ICE.

9  TAKES AND THEN BEGINS TO MAKE THE METHAMPHETAMINE AND

10  ENGAGES IN A LOT OF ASSOCIATIONS WITH FEMALES WHO ARE ALSO

11  USING THESE MEDICATIONS -- I MEAN, THESE ILLICIT DRUGS

12  WITH HIM.  AND HE IS, OF COURSE, ARRESTED AND FACING THIS

13  COURT FOR SENTENCING TODAY BECAUSE OF THOSE DIFFICULTIES.

14          MY RECOMMENDATIONS WERE THAT HE IS OBVIOUSLY

15  GOING TO BE INCARCERATED BUT THAT THOSE MATTERS BE TAKEN

16  INTO ACCOUNT, THE DEPRESSION, THE SUBSTANCE ABUSE AND THE

17  SEXUAL ABUSE WHEN HE IS SENTENCED BECAUSE THERE ARE

18  PLACEMENTS WHERE HE MIGHT BENEFIT FROM SOME OF THOSE KINDS

19  OF THERAPISTS OR TREATMENTS.

20     Q.   THANK YOU, DOCTOR.  A COUPLE OF QUESTIONS ABOUT

21  YOUR TESTING.  ALL OF THESE TESTS HAVE VALIDITY INDICATORS

22  BUILT IN; IS THAT CORRECT?

23     A.   NOT ALL OF THEM, MOST OF THEM.  AND AGAIN, THAT'S

24  WHY WE GIVE THE VALIDITY INDICATOR PROFILE TO KIND OF CAST

25  THE NET WIDE AND WE GET A DOUBLE, A BACK UP MEASURE NOT

Case 6:07-cv-00937-RDP-PWG   Document 4-4   Filed 09/17/08   Page 22 of 86

1    ONLY FOR THOSE THAT HAVE VALIDITY INDICES.  BUT FOR THOSE

2    WHO DON'T, AT LEAST WE HAVE ONE.

3         Q.   DO ALL THESE REPORTS APPEAR TO BE VALID?

4         A.   THAT'S CORRECT.

5         Q.   NOW, YOU MENTIONED MENTAL HEALTH ISSUES AS WELL

6    AS ILLICIT DRUG USE?

7         A.   YES, SIR.

8         Q.   HOW DID THOSE AFFECT ONE ANOTHER?

9         A.   WELL, OF COURSE, ON THE SHORT TERM BASIS, ICE OR

10   METHAMPHETAMINE IS ONE OF THE MOST ADDICTIVE SUBSTANCES

11   THAT WE KNOW OF AND THE THIRD LEADING DRUG OF ABUSE THESE

12   DAYS IN AMERICA, FOLLOWING ALCOHOL AND MARIJUANA.  IF A

13   PERSON IS DEPRESSED, THE METHAMPHETAMINE, WHICH IS USUALLY

14   ADDICTIVE, THERE IS A COMPOUNDING EFFECT BECAUSE IT

15   ALLEVIATES THE DEPRESSION PROMPTLY BUT, AGAIN, YOU HAVE TO

16   DOSE AND RE-DOSE.  AND TOLERANCE BUILDS UP AND YOU HAVE TO

17   DO MORE UNTIL THE POINT YOU SEE THESE PEOPLE THAT ARE

18   EMACIATED WITH THE SKIN LESIONS AND NO TEETH.

19        Q.   NOW, YOU SAID IT EXACERBATES SYMPTOMS, I GUESS,

20   OF BOTH?

21        A.   YES.

22        Q.   NOW, IN YOUR FINDINGS, DO YOU FIND ANY

23   SIGNIFICANCE TO THE FACT THAT FOR 33 YEARS HE HAD WHAT YOU

24   CALL I THINK AN UNREMARKABLE PAST, BUT THEN TO GO INTO

25   SUCH A HORRIFIC DOWNWARD SPIRAL, WERE YOU ABLE TO HAVE ANY

Case 6:12-cv-09037-RDP-JHE Document 4-4 Filed 09/17/13 Page 23 of 87

1  FINDINGS OR ANY CONCLUSIONS ABOUT THAT?

2      A.  WELL, IT'S CERTAINLY AN ABERRANT EVENT IN HIS

3  LIFE HISTORY; HOWEVER, IT'S NOT THAT UNCOMMON TO SEE

4  PEOPLE THAT HAVE TROUBLES AND STRESSORS AND SO FORTH THAT

5  ARE SUFFERING THEN FROM DEPRESSION THAT GET INTO SOME

6  CHEMICAL SUBSTANCE ABUSE THAT BECOMES QUITE SIGNIFICANT IN

7  A PRETTY SHORT PERIOD OF TIME.  AND THIS PARTICULAR

8  CHEMICAL IS OVERWHELMINGLY MIND ALTERING, SO PEOPLE WHO

9  ARE NORMALLY CALM AND FAIRLY PASSIVE CAN BECOME VERY WIRED

10  AND VIOLENT.  PLUS, COMING OFF THE METHAMPHETAMINE MAKES

11  THE DEPRESSION REBOUND WORSE.

12          AND SO YOU ARE IN A VICIOUS CYCLE THAT IS

13  PROBABLY ONLY GOING TO BE TREATED SUCCESSFULLY IN AN

14  INPATIENT, LONG TERM FACILITY.

15      Q.  IS IT TREATABLE?

16      A.  IT'S TREATABLE.

17      Q.  AND BASED ON YOUR ANALYSIS AND YOUR EXAMINATIONS

18  AND YOUR FINDINGS, IS PIERRE FALGOUT POTENTIALLY

19  REHABILITATABLE?

20      A.  THERE IS INDICATIONS THAT HE IS RECEPTIVE TO THE

21  TREATMENT AND, OF COURSE, THERE IS A LOT OF FACTORS THAT

22  GO INTO THAT PARTICULAR QUESTION, AND THAT IS WHAT KIND OF

23  TREATMENT DOES HE GET AND HOW RECEPTIVE IS HE TO THAT

24  TREATMENT.  AND ARE THERE SUCCESSFUL MILESTONES OVER TIME

25  THAT HE CAN REACH AND COMPLETE.  BUT I CERTAINLY THINK

1  THAT HE RECOGNIZES THE OVERWHELMING TROUBLE THAT
2  METHAMPHETAMINE HAS BROUGHT HIM.
3      Q.  NOW, DR. PRESTON, HAVE YOU HAD AN OPPORTUNITY TO
4  REVIEW ANY OF THE MATERIAL THAT'S BEEN ENTERED AS EVIDENCE
5  IN THE SUBSTANCE OF THE CHARGES IN THIS CASE?
6      A.  YES, SIR, I HAVE.
7      Q.  DOES THAT ALTER OR AFFECT YOUR OPINIONS OR YOUR
8  FINDINGS IN ANY WAY?
9      A.  NO.  I THINK, OF COURSE, IT GOES TO SPEAK TO THE
10  ISSUE OF THE ERRATIC KIND OF BEHAVIORS THAT CAN HAPPEN
11  WHEN SOMEBODY IS CHRONICALLY ABUSING METHAMPHETAMINE.
12      Q.  IN ANY OF YOUR TESTS, DID YOU FIND, OTHER THAN
13  WHAT YOU HAVE SPOKEN TO ABOUT THE PREDISPOSITION AT ONE
14  POINT IN TIME OF HIS LIFE TO BE DRUG ADDICTED, DID YOU
15  FIND ANY, OR DO YOUR TESTS TEST FOR ANY PREDISPOSITIONS
16  FOR PEDOPHILIA OR DEVIANT SEXUAL INTERESTS?
17      A.  YES, SEVERAL OF THOSE.
18      Q.  DID YOU FIND HIM TO BE PREDISPOSED TO ANY OF
19  THOSE?
20      A.  WELL, CERTAINLY THE TESTS ARE NOT SHOWING
21  PEDOPHILIC TENDENCIES.  HOWEVER, THE THOUGHTS, FEELINGS,
22  AND BEHAVIOR ARE NEVER STATIC, MEANING THAT MOST EVERY
23  HUMAN HAS THE POTENTIAL, GIVEN THE RIGHT CHEMICAL MIX, TO
24  DEVIATE FROM WHAT THEIR NORMAL BEHAVIOR WOULD BE.  SO THE
25  SUBSTANCE OF SOME OF THE PHOTOS AND THE FILMS OBVIOUSLY

1   INVOLVE CHILDREN, YET THERE IS NO INDICATION THAT -- WELL,

2   THE DEFINITION OF PEDOPHILIA IS THAT THERE IS, USUALLY

3   THAT'S THE PREFERENCE OF A PERSON, AND IT GENERALLY IS

4   THEIR PREFERENCE AND CONTINUES TO BE THEIR PREFERENCE

5   UNTIL THE END OF TIME.  SO THERE IS SOME EVIDENCE TO SHOW

6   THAT AT THAT POINT HE CERTAINLY WAS INTERESTED IN

7   CHILDREN.  HOWEVER, I DON'T, YOU KNOW, BY THE TIME I

8   TESTED HIM HERE, HE SPENT TIME IN JAIL AND GOT SOME

9   SEMBLANCE OF HIS FACULTIES BACK, ALTHOUGH THAT CLINICAL

10  STUDY SHOWS THAT SOME OF THAT YOU NEVER GET BACK.  AND

11  IT'S AT LEAST ABOUT TWO YEARS BEFORE YOU CAN  TO TOTALLY

12  CLEAR FROM THE NEUROLOGICAL EFFECTS OF CHRONIC METH USE.

13      Q.   IS CHRONIC METH USE, I GUESS YOU ARE SAYING

14  CHRONIC METH USE CAN HAVE LIFELONG NEUROLOGICAL EFFECTS?

15      A.   THAT'S POSSIBLE, YES.

16      Q.   WAS HE TESTED FOR ANY OF THOSE OR IS THAT BEYOND

17  THE SCOPE OF --

18      A.   THAT'S BEYOND THE SCOPE OF MY SPECIALTY.

19      Q.   ONE OTHER QUESTION, DR. PRESTON.  NOW, JUST AS A

20  MATTER OF ISSUE.  YOU HAVE PREVIOUSLY DONE WORK FOR THE

21  UNITED STATES GOVERNMENT; IS THAT CORRECT?

22      A.   YES, SIR, I HAVE.

23      Q.   AND THERE WAS ONCE AN ISSUE AND YOU WERE ON A

24  PRETRIAL DIVERSION PROGRAM; IS THAT CORRECT?

25      A.   THAT'S CORRECT.

1    Q.   HAS THERE EVER BEEN ANY QUESTION ABOUT ANY OF

2  YOUR OPINIONS OR --

3    A.   NOT TO MY KNOWLEDGE.

4    Q.   -- OR YOUR PRACTICE OR YOUR QUALIFICATIONS OR

5  THE STANDARD OF YOUR WORK?

6    A.   NOT TO MY KNOWLEDGE.

7    Q.   AND NO DOUBT YOU ARE HERE TODAY AS A PAID

8  WITNESS; IS THAT CORRECT?

9    A.   THAT'S CORRECT.

10    Q.   DID THE AMOUNT OF MONEY THAT YOU HAVE BEEN PAID

11  HAVE ANY EFFECT ON YOUR TESTIMONY HERE AND THE AMOUNT OR

12  ANY OF YOUR OPINIONS IN ANY WAY?

13    A.   NO, SIR.

14    Q.   FINALLY, DR. PRESTON, YOU TESTIFIED THAT YOU

15  THINK REHABILITATION IS POSSIBLE, IS THAT --

16    A.   THAT'S CORRECT.

17    Q.   AND GIVEN THE RIGHT ENVIRONMENT AND TREATMENT

18  THAT PIERRE FALGOUT CAN BE REHABILITATED?

19    A.   THAT'S POSSIBLE, YES.

20    Q.   AND BASED ON HIS HISTORY PRIOR TO THESE EVENTS,

21  IS IT POSSIBLE THAT HE COULD RETURN TO A PRODUCTIVE STATUS

22  AS A HUMAN BEING?

23    A.   THAT'S ALSO POSSIBLE.

24          MR. REID:  I WILL PASS THE WITNESS, YOUR

25  HONOR.

Case 6:07-cv-00037-RDP-PHT Document 44 Filed 09/17/08 Page 27 of 87
Case 6:07-cv-00037-RDP-RRA Document 40 Filed 09/17/08 Page 27 of 86

27

```
 1              THE COURT:  ALL RIGHT.  CROSS EXAMINATION.
 2              CROSS EXAMINATION BY MS. BURRELL:
 3         Q.   DR. PRESTON, I'M REMEMBER MARY STUART BURRELL
 4    WITH THE U.S. ATTORNEYS OFFICE AND I THINK WE HAVE MET
 5    BEFORE AND SPOKEN BEFORE.
 6              JUST TO GO AHEAD AND FINISH UP A LITTLE BIT
 7    ABOUT WHAT MR. REID WAS ASKING YOU ABOUT YOUR PRIOR
 8    PROBLEM WITH THE FEDERAL GOVERNMENT, ACTUALLY WHAT YOU
 9    WERE ACCUSED OF DOING AND WHAT YOU ADMITTED TO DOING,
10    ISN'T IT TRUE THAT IT WAS FOR SUBMITTING FRAUDULENT BILLS
11    TO THE UNITED STATES GOVERNMENT; IS THAT CORRECT?
12         A.   THAT'S CORRECT.
13         Q.   AND YOU HAVE, YOU PARTICIPATED IN A PRETRIAL
14    DIVERSION PROGRAM AND ACTUALLY PAID BACK RESTITUTION
15    BECAUSE OF THE FRAUDULENT BILLING PRACTICES THAT YOU AND
16    YOUR OFFICE HAD ENGAGED IN; IS THAT CORRECT?
17         A.   THAT'S CORRECT.
18         Q.   NOW, IF I UNDERSTAND YOUR TESTIMONY, DR. PRESTON,
19    BASICALLY WHAT YOU HAVE SAID IS THAT MR. FALGOUT HAD SOME
20    STRESSORS IN HIS LIFE; IS THAT CORRECT?
21         A.   THAT'S CORRECT.
22         Q.   AND SOME DEPRESSION IN HIS LIFE; IS THAT CORRECT?
23         A.   RIGHT.
24         Q.   AND SOME PROBLEMS WITH WORK?
25         A.   RIGHT.
```

1    Q.   AND AT SOME POINT, VOLUNTARILY STARTED TAKING

2    METHAMPHETAMINE; IS THAT CORRECT?

3    A.   YES.

4    Q.   AND THEN, DURING THAT TIME FRAME, COMMITTED THESE

5    ATROCIOUS CRIMES; IS THAT CORRECT?

6    A.   YES.

7    Q.   AND OF COURSE, YOU HAVE SEEN THE VIDEOTAPE AND

8    THIS MORNING I ACTUALLY SHOWED YOU THE PHOTOGRAPHS; IS

9    THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   BUT YOU HAD NOT SEEN ANY OF THAT EVIDENCE WHEN

12   YOU CONDUCTED ALL OF THE TESTS THAT YOU CONDUCTED AND WHEN

13   YOU INTERVIEWED MR. FALGOUT; IS THAT CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   NOW, IF I UNDERSTOOD YOU CORRECTLY, ONE OF THE

16   THINGS THAT YOU SAID WAS THAT THE DEFENDANT TOLD YOU THAT

17   HE HAD NO INTEREST IN BONDAGE; IS THAT CORRECT?

18   A.   THAT'S CORRECT.

19        MS. BURRELL:  MAY I APPROACH THE WITNESS?

20        THE COURT:  YOU MAY.

21   Q.   LET ME SHOW YOU, DR. PRESTON, WHAT'S BEEN

22   PREVIOUSLY MARKED GOVERNMENT'S EXHIBIT FIVE AND ASK YOU

23   WHAT THAT PICTURE APPEARS TO BE TO YOU?

24   A.   WELL, EARLIER WHEN WE SPOKE YOU HAD MENTIONED

25   THAT THAT WAS DUCT TAPE ON A CHILD AND THAT HIS HANDS WERE

Case 6:07-cv-00037-RDP-PHF Document 44 Filed 09/17/08 Page 29 of 87
Case 6:07-cv-00037-RDP-PHF Document 44 Filed 09/17/08 Page 29 of 86

29

1    BOUND BY DUCT TAPE.  ALTHOUGH I CAN'T REALLY SEE THE DUCT

2    TAPE, I BELIEVE THAT'S WHAT IT IS.

3         Q.   WELL, SOME KIND OF TAPE, SOME KIND OF BLACK TAPE,

4    MAYBE ELECTRICAL TAPE OR SOMETHING LIKE THAT?

5         A.   YES; YES.

6         Q.   WHERE IS THE TAPE ON THE CHILD'S BODY THAT YOU

7    CAN SEE?

8         A.   IT APPEARS TO BE ON THE MOUTH IN THE CHEEK AREA

9    AND PERHAPS ON THE WRISTS OR HANDS.

10        Q.   DO YOU NOT THINK THAT PICTURE QUALIFIES AS SOME

11   KIND OF BONDAGE?

12        A.   IT VERY WELL COULD.  IT VERY WELL IS.

13        Q.   ALL RIGHT.  NOW, EXPLAIN TO ME WHAT A FETISH IS,

14   BECAUSE YOU'RE TELLING THE COURT AND YOU HAVE TESTIFIED

15   TODAY AND YOU PUT IN YOUR REPORT THAT THE COURT HAS

16   REVIEWED THAT MR. FALGOUT HAD NO INTEREST IN ANY KIND OF

17   FETISHES.  EXACTLY WHAT IS A FETISH?

18        A.   A FETISH IS AN ATTRACTION TO A THING THAT HAS A

19   SEXUALLY STIMULATING EFFECT ON SOMEONE.  GENERALLY, THAT

20   WOULD BE THINGS LIKE LINGERIE, SHOES, UNDERWEAR, HAIR.

21        Q.   WELL, LET ME ASK YOU THIS.  ISN'T THERE A FETISH

22   THAT HAS TO DO WITH FECES?

23        A.   I WOULDN'T ACTUALLY CALL THAT A FETISH, BUT THERE

24   IS A PARAPHILIA WHICH IS A SEXUAL DISORDER THAT HAS TO DO

25   WITH SCOTELAGIA, AND THAT'S FILTH OR FECES.

1   Q.   AND INSTEAD OF GOING THROUGH ALL THOSE PICTURES

2   BECAUSE THERE IS NUMEROUS PICTURES, AND INSTEAD OF US

3   PLAYING THE VIDEOTAPE, HAVE YOU SEEN ANY EVIDENCE WHEREIN

4   MR. FALGOUT MIGHT HAVE GOTTEN SOME KIND OF SICK PLEASURE

5   OUT OF SEEING THESE CHILDREN WITH FECES ON THEIR FACE,

6   FECES TAPED IN A DIAPER AROUND THEIR HEAD, FECES ALL OVER

7   THEIR BODY, FECES ON THEIR SCROTUM, THEIR PENIS, THEIR

8   BOTTOM, NUMEROUS PICTURES LIKE THAT; IS THAT CORRECT?

9   A.   THAT'S CORRECT.

10  Q.   WHAT DOES THAT TELL YOU ABOUT MR. FALGOUT?

11  A.   WELL, OBVIOUSLY AT THAT TIME HE HAD SOME INTEREST

12  IN THAT PARTICULAR, THOSE SUBSTANCES.

13  Q.   OKAY.  AND CAN YOU TELL ME BECAUSE YOU SAID THAT

14  MR. FALGOUT WOULD NOT ADMIT TO YOU THAT HE HAD ANY

15  INTEREST EITHER IN SADOMASOCHISTIC ABUSE, WHAT IS YOUR

16  DEFINITION OF THAT?

17  A.   SADOMASOCHISM, OF COURSE, IS THE NEED OR DESIRE,

18  THE SADISTIC PART IS THE NEED TO OR THE PLEASURE OF

19  INFLICTING PAIN ON TO SOMEONE AND GENERALLY IN A SEXUAL

20  MANNER.  MASOCHISM IS THE NEED OR THE STIMULATION, SEXUAL

21  STIMULATION TO RECEIVE PAIN.

22  Q.   HAVE YOU SEEN THE VIDEOTAPE?

23  A.   I HAVE.

24  Q.   YOU DON'T THINK THAT THAT QUALIFIES AS

25  SADOMASOCHISTIC ABUSE OF THAT CHILD IN THAT VIDEOTAPE?

1    A.  WELL, CERTAINLY THERE IS SOME SADISTIC ACTS GOING

2  ON.

3    Q.  AND FINALLY, YOU SAID THAT HE WOULD NOT ADMIT TO

4  YOU THAT HE WAS A PEDOPHILE OR HAD ANY INTEREST, SEXUAL

5  INTEREST IN CHILDREN.  HOW DO YOU EXPLAIN, IF HE WAS BEING

6  TRUTHFUL TO YOU, THE NUMEROUS PICTURES THAT YOU HAVE GOT

7  IN FRONT OF YOU?  AND IF YOU WANT TO LOOK AT THEM, YOU ARE

8  WELCOME TO LOOK AT THEM AGAIN.  BUT THE NUMEROUS PICTURES

9  YOU AND I WENT OVER THIS MORNING WHERE THE ONLY THING IN

10  THE PICTURE, THE CENTER OF ATTENTION OF THE PICTURE ARE UP

11  CLOSE IMAGES OF THOSE CHILD'S ANUS AND THOSE CHILD'S

12  PENIS, HOW DO YOU RECONCILE THE FACT THAT HE THINKS HE IS

13  NOT A PENIS -- HE IS NOT A PEDOPHILE BUT THAT'S WHAT HE

14  WANTED IMAGES OF?

15    A.  WELL, AGAIN, THE PART ABOUT BEHAVIOR, THOUGHT AND

16  FEELING BEING IT'S NEVER STATIC, AND IT'S CERTAINLY HIGHLY

17  INFLUENCED BY BIOCHEMISTRY.  AND THERE IS CERTAINLY A

18  PLETHORA OF RESEARCH THAT SHOWS THAT PEOPLE WITHOUT

19  CHEMICALS VERSUS WITH CHEMICALS ACT, THINK, AND FEEL

20  DIFFERENTLY.  AND THE ONLY EXPLANATION I CAN COME UP WITH

21  FOR THAT WOULD BE TO SAY AGAIN THE CHRONIC USE OF

22  METHAMPHETAMINE MIGHT EXPLAIN THAT.

23    Q.  WELL, YOU'RE NOT TESTIFYING THAT THE CHRONIC USE

24  OF METHAMPHETAMINE MADE HIM THINK THOSE THINGS, ARE YOU?

25  OR ARE YOU SAYING THAT THE FACT THAT HE WAS A CHRONIC USER

1  OF METHAMPHETAMINE MAYBE LOWERED HIS INHIBITION AND LET

2  HIM ACT ON AND DO THE THINGS THAT MAYBE HE THOUGHT ABOUT

3  ANYWAY.  WHICH ONE OF THOSE ARE YOU SAYING OR DO YOU KNOW,

4  OR CAN YOU KNOW?

5       A.  WELL, ONE, YOU CAN'T KNOW FOR SURE, BUT I SUSPECT

6  IT MIGHT BE A COMBINATION OF BOTH.

7       Q.  OKAY.  NOW, I BELIEVE YOU --

8            THE COURT:  LET ME ASK A QUESTION ABOUT THAT.

9            THE WITNESS:  YES, SIR.

10            THE COURT: DR. PRESTON, ARE THERE STUDIES THAT

11  WOULD SUGGEST THAT USE OF NARCOTICS OR CONTROLLED

12  SUBSTANCES REMOVE KIND OF THE GENERAL RESTRAINTS SOMEONE

13  MAY HAVE TO ACT OUT ON FEELINGS LIKE THAT?

14            THE WITNESS:  YES, SIR.

15            THE COURT:  ALL RIGHT.

16       Q.  DR. PRESTON, YOU SAID ON PAGE FIVE OF YOUR REPORT

17  THAT IN YOUR TALKING ABOUT THAT, MR. FALGOUT WAS AWARE OF

18  THE VIDEOS AND PICTURES DEPICTING THE CHILDREN, THAT HE

19  WAS AWARE OF THEM, BUT THEN HE GOES ON TO TELL YOU THAT HE

20  ACKNOWLEDGES VIDEOTAPING SOME OF THE CHILDREN NAKED,

21  THINKING THAT SOME OF THEIR ACTIONS WERE CUTE?

22       A.  YES.

23       Q.  IS HE TALKING ABOUT THAT VIDEOTAPE THAT HE

24  THOUGHT THAT WAS CUTE?

25       A.  NO.  HE WAS TALKING SPECIFICALLY IN THIS EVENT

1  THAT HE HAD TAKEN SOME CHILDREN WITH THEIR MOTHER OUT TO

2  THE COUNTRY AND THEY WERE IN THE, OUT IN NATURE SOMEWHERE,

3  AND THAT THEY, THE MOTHER WAS THERE AND THEY WERE ACTUALLY

4  PLAYING, RUNNING AROUND AND AT SOME POINT THAT THEY EITHER

5  TOOK THEIR CLOTHES OFF OR SOMEBODY HAD THEM TAKE THEIR

6  CLOTHES OFF AND HE HAD APPARENTLY FILMED THAT EVENT.

7       Q.  OKAY.

8       A.  BUT NOT THE VIDEOTAPES SPECIFICALLY THAT HAVE

9  BEEN ENTERED INTO EVIDENCE.

10      Q.  AND SOME OTHER, AT SOME OTHER POINT DURING YOUR

11 REPORT HE TELLS YOU THAT HE BLACKED OUT AND REALLY

12 COULDN'T RECALL PRODUCING ANY OF THESE IMAGES.  DID HE

13 TELL YOU THAT AT SOME POINT?

14      A.  I BELIEVE SO, YES.

15      Q.  HAVE YOU SEEN THE LETTER THAT HE WROTE ON JANUARY

16 17 OF 2008 THAT WAS GIVEN TO THE JUDGE?

17      A.  I AM NOT CERTAIN.

18      Q.  OKAY.  WELL, LET ME SHOW IT TO YOU AND JUST SEE

19 IF YOU --

20           THE COURT:  MARK IT FOR IDENTIFICATION FIRST,

21 PLEASE.

22                MS. BURRELL:  DOES THE COURT HAVE ONE IN

23 ITS FILE?

24           THE COURT:  I AM NOT SURE THAT I DO.

25      Q.  I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY

1  MARKED GOVERNMENT'S EXHIBIT 50 AND ASKED YOU IF YOU WERE

2  PROVIDED A COPY OF THAT?

3      A.   YES, I HAVE SEEN THIS.

4      Q.   OKAY.  YOUR HONOR -- DO YOU HAVE IT IN YOUR FILE?

5      A.   I DO SOMEWHERE.

6      THE COURT:  CAN I SEE IT?

7      MS. BURRELL:  YOUR HONOR --

8      THE COURT:  YES, I HAVE THIS?

9      MS. BURRELL:  YOUR HONOR, WE WOULD OFFER

10 GOVERNMENT'S EXHIBIT 50 INTO EVIDENCE AT THIS TIME, EVEN

11 THOUGH THE COURT HAS ONE IN ITS FILE.

12     THE COURT:  WITHOUT OBJECTION, IT'S RECEIVED.

13       THE WITNESS:  I'M LOOKING.  I HAVE IT.

14     Q.   NOW, IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY,

15 YOU SAID THAT HE TOLD YOU HE DID NOT RECALL PRODUCING THE

16 VIDEOTAPES AND THE PICTURES, THAT HE WAS PROBABLY BLACKED

17 OUT FROM METHAMPHETAMINE USE, IS THAT WHAT HE TOLD YOU

18 BASICALLY?

19     A.   PORTIONS OF THAT AND/OR HE WAS FOGGY ON THAT.

20     Q.   WELL, HE HAS WRITTEN A LETTER THAT HAS BEEN GIVEN

21 TO THE JUDGE FOR THE JUDGE'S CONSIDERATION AND SAYS THAT

22 HE CAN SPECULATE AS TO WHY HE MADE THESE.  AND THAT AS TO

23 THE ONE WITH THE FECES, THE VIDEOTAPE IN THE PICTURES WITH

24 THE FECES, THAT HE WAS TAKING THOSE PICTURES TO PROVE TO

25 THESE CHILDREN'S MOTHER HOW MESSY THE CHILDREN WERE.

Case 6:12-cv-00037-RDP-NHF  Document 64  Filed 09/17/13  Page 35 of 87
Case 6:12-cv-00037-RDP-PRA  Document 40  Filed 09/17/13  Page 35 of 86

35

1        NOW, DID YOU SEE THE PICTURE THIS MORNING

2   WHERE THE LITTLE BOY'S GOT FECES ALL OVER HIS FACE, HIS

3   HEAD AND THE REST OF HIS BODY?

4       A.   I DID.

5       Q.   AND DID YOU SEE THE VIDEOTAPE THAT'S GOT THE

6   DIAPER TAPED TO THE CHILD'S HEAD WITH FECES ALL IN THE

7   DIAPER AND FECES RUNNING OUT THE BOTTOM OF THE DIAPER?

8       A.   YES, MA'AM.

9       Q.   DOES THAT LOOK LIKE SOMETHING THAT YOU WOULD TAKE

10  A PICTURE OF SO THAT YOU COULD SHOW THE MOMMA HOW MESSY

11  THE CHILD WAS?  I MEAN, IS THAT A LOGICAL EXPLANATION TO

12  YOU, DR. PRESTON OF --

13      A.   NO.

14      Q.    -- WHY HE TOOK THOSE PICTURES?

15      A.   NO, IT WOULDN'T BE A LOGICAL EXPLANATION.

16      Q.   AND WHAT ABOUT THE PICTURE, THE VIDEOTAPE OF THE

17  LITTLE BOY THAT CAN'T WALK WHO IS OBVIOUSLY UNDER THE

18  INFLUENCE OF SOMETHING AND WHO LATER TESTED POSITIVE FOR

19  METHAMPHETAMINE?  DOES THAT LOOK LIKE A GAME OF HIDE AND

20  SEEK, WHICH IS WHAT HE SAYS IN HIS LETTER?

21      A.   IT DOESN'T LOOK LIKE A GAME OF HIDE AND SEEK TO

22  ME, NO.

23      Q.   AND AGAIN, DID THAT VIDEOTAPE LOOK LIKE A GAME

24  OF -- YOU REMEMBER WHEN YOU WERE LITTLE AND YOU USED TO

25  TURN AROUND AND THEN TRY TO STAND UP AND SEE HOW LONG YOU

1  COULD STAND UP WHEN YOU WERE A CHILD AND YOU WOULD PLAY

2  THAT GAME?  HE APPEARS TO BE SAYING IN HIS LETTER THAT

3  THAT'S WHAT THE VIDEOTAPE WAS.  DID THAT LOOK LIKE THAT TO

4  YOU?

5      A.  NO.

6      Q.  AND LET ME ASK YOU ABOUT THE VIDEOTAPE.  YOU HAVE

7  SEEN THE VIDEOTAPE OF THE CHILD WHO CAN'T STAND UP,

8  HAVEN'T YOU?

9      A.  I HAVE.

10     Q.  DOES THAT CHILD LOOK LIKE HE IS UNDER THE

11  INFLUENCE OF SOMETHING TO YOU?

12         MR. REID:  I OBJECT TO THAT, YOUR HONOR.

13         THE COURT:  OVERRULED.

14     A.  WELL, CERTAINLY THE CHILD IS HAVING SOME

15  DIFFICULTY MAINTAINING BALANCE.  AND THERE APPEARS TO BE

16  SOME TREMOR FROM THE CHILD, AND THAT LIKELY INDICATES

17  EITHER SOME SORT OF DISEASE PROCESS GOING ON, COULD BE

18  CEREBRAL PALSY OR SOME NEUROMUSCULAR PROBLEM.  OR, AGAIN,

19  SOMETHING BIOCHEMICAL SUCH AS SUBSTANCE USE OR BEING UNDER

20  THE INFLUENCE OF SUBSTANCES.

21     Q.  WHAT IF I TOLD YOU THE CHILD HAS BEEN CHECKED OUT

22  MEDICALLY AND HE HAS NO KNOWN DISEASE PROCESSES BUT DID

23  TEST VERY HIGH POSITIVE FOR METHAMPHETAMINE?

24     A.  THEN THAT'S A LIKELY EXPLANATION.

25     Q.  AND DOES THAT LOOK CONSISTENT WITH THE CHILD

1  BEING UNDER METHAMPHETAMINE AT THE TIME?

2      A.  YES.

3      Q.  WERE YOU ABLE TO SEE THE CHILD'S PUPILS AT ALL IN

4  THE VIDEOTAPE?  DID YOU NOTICE IT AT ALL?

5      A.  NO, I DON'T RECALL NOTICING THE PUPILS.

6      Q.  BUT IN ANY EVENT, THAT DID NOT LOOK LIKE THE GAME

7  OF TURNING IN CIRCLES AND GETTING YOURSELF DIZZY TO THE

8  POINT OF FALLING DOWN.  THAT DID NOT LOOK LIKE THAT GAME

9  IN THAT VIDEOTAPE, DID IT?

10      A.  NO.

11      Q.  OKAY.  SO BASICALLY, DR. PRESTON, WHAT I HEARD

12  YOU TESTIFY TO THE COURT TODAY IS ABOUT THIS MAN'S

13  HISTORY, WHICH TO ME SOUNDS LIKE A HISTORY OF PROBABLY

14  MILLIONS OF OTHER PEOPLE IN THE UNITED STATES.  AND OTHER

15  THAN THESE HORRENDOUS ACTS THAT HE COMMITTED, BUT THE

16  DEPRESSION, THE GETTING TRANSFERRED IN YOUR JOB, LOSING

17  YOUR JOB, BANKRUPTCY, FAILED RELATIONSHIPS, I MEAN, THAT

18  COULD BE A MILLION PEOPLE IN THE UNITED STATES, CORRECT?

19      A.  IT COULD BE.

20      Q.  AND THAT YOU ARE OF THE OPINION THAT HE NEEDS

21  SUBSTANCE ABUSE TREATMENT?

22      A.  YES.

23      Q.  AND THAT YOU ARE OF THE OPINION THAT HE NEEDS SEX

24  OFFENDER TREATMENT?

25      A.  YES.

1   Q.  AND THAT THERE IS A POSSIBILITY, ALTHOUGH YOU

2  CAN'T TESTIFY ONE WAY OR THE OTHER, THAT HE COULD BE

3  REHABILITATED BUT YOU DON'T KNOW BECAUSE YOU WOULD NOT BE

4  THE ONE DOING HIS TREATMENT; IS THAT WHAT I HAVE HEARD YOU

5  TESTIFY TO?

6   A.  THAT'S CORRECT.

7          MS. BURRELL:  THAT'S ALL WE HAVE, YOUR

8  HONOR.

9          THE COURT:  ALL RIGHT.  ANY REDIRECT?

10          MR. REID:  NO, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN SIR.

12          THE WITNESS:  THANK YOU, SIR.

13          THE COURT:  ALL RIGHT.  MR. REID.

14          MR. REID:  THAT'S ALL WE HAVE IN THE EVIDENTIARY

15  PART OF OUR PRESENTATION, YOUR HONOR.  WE WOULD HAVE

16  ADDITIONAL THINGS IN THE MITIGATION PHASE.

17          THE COURT:  ALL RIGHT, VERY WELL.  LET'S TAKE A

18  FIVE MINUTE BREAK AND WE WILL BE BACK IN ABOUT FIVE

19  MINUTES.

20          (BRIEF RECESS)

21          THE CLERK:  REMAIN SEATED AND COME TO ORDER,

22  PLEASE.

23          THE COURT:  ARE WE READY TO PROCEED TO

24  ALLOCUTION?  IS THAT WHERE WE ARE, AND YOUR ARGUMENTS WITH

25  RESPECT TO VARIANCE?

1    MR. REID:  YES, YOUR HONOR.

2         THE COURT:  YOU CAN ADDRESS NOW THOSE.

3    MR. REID:  YOUR HONOR, AS FAR AS TO THE ISSUE OF

4 VARIANCE, IN LOOKING AT THE PRESENTENCE REPORT AS IT IS

5 STATED, IT CALLS FOR A SENTENCE WHICH IS EQUIVALENT OF 960

6 YEARS.

7    THE COURT:  THAT'S BY TAKING THE STATUTORY

8 MAXIMUM ON EACH OF THE 32 SUBSTANTIVE COUNTS.

9    MR. REID:  CORRECT.

10    THE COURT:  WHICH IS INDICATED, ACCORDING TO THE

11 PROBATION OFFICE, BY APPLICATION OF THE GUIDELINES BECAUSE

12 ALTHOUGH THE GUIDELINES CALL FOR A LIFE SENTENCE, NONE OF

13 THE OFFENSES PROVIDE FOR A LIFE SENTENCE BASED UPON THE

14 STATUTORY MAXIMUM FOR EACH ONE.

15    MR. REID:  THAT'S CORRECT.  OUR MOTION IS THAT IT

16 IS, THE GUIDELINES AND THE GUIDELINES NOT CALLED FOR AN

17 APPROPRIATE SENTENCE IN THIS IN LIGHT OF THE SENTENCING

18 FACTORS AT 3553(A) IN THAT A 960 YEAR SENTENCE IS NOT

19 PRACTICAL AND IS NOT, WE BELIEVE, NOT REASONABLE IN THIS

20 CASE.  WHEN YOU LOOK AT A SENTENCE THAT IS SUFFICIENT BUT

21 NOT GREATER THAN NECESSARY, WE DO THINK THAT THE

22 GUIDELINES ARE NOT CALLED FOR AN APPROPRIATE SENTENCE

23 BECAUSE IT DOES NOT TAKE INTO ACCOUNT THE TIME OF THESE,

24 LIFETIME OF THE DEFENDANT, THE CONSIDERATIONS OF 3553,

25 MUST CONSIDER THE NATURE OF THE OFFENSE BUT AT THE SAME

1  TIME HAS TO CONSIDER THE HISTORY OF THE DEFENDANT AND
2  CHARACTERISTICS OF THE DEFENDANT.  WE BELIEVE THOSE ARE
3  NOT TAKEN INTO CONSIDERATION THERE.

4        IT ALSO HAS TO REFLECT THE SERIOUSNESS OF THE
5  OFFENSE, PROMOTE RESPECT FOR THE LAW AND JUST PUNISHMENT,
6  BUT IT HAS TO BE REASONABLE IN ITS IMPLICATION.

7        FOR THOSE REASONS, YOUR HONOR, WE THINK THAT THE
8  GUIDELINES ARE NOT APPROPRIATE IN THIS CASE AND THAT THE
9  STATUTORY MAXIMUMS AND MINIMUMS THAT ARE PUT IN PLACE BY
10 CONGRESS AND LEGISLATIVELY DECIDED ARE THERE FOR A REASON,
11 AND THEY SET THE GUIDELINES AND THE PARAMETERS THAT THE
12 COURT SHOULD CONSIDER IN THIS CASE.  AND WE WOULD SAY,
13 YOUR HONOR, THAT BECAUSE OF THE LIMITED NUMBER OF THE
14 VICTIMS, THAT IS NOT WHERE THERE IS DOZENS AND DOZENS OF
15 VICTIMS, IT IS NOT SPREAD OVER A GREAT AMOUNT OF TIME IN
16 COMPARISON TO THE LIFETIME OF THE DEFENDANT, THAT TO
17 CONSIDER THEM SEPARATELY AND IN THE NATURE OF THAT
18 CONSECUTIVE TYPE IMPLICATION IS NOT REASONABLE WITHIN THE
19 GUIDELINES AND A VARIANCE WOULD BE APPROPRIATE UNDER THAT
20 SCENARIO.

21       THE COURT:  JUST ASKING THIS, WHAT
22 SPECIFICALLY ARE YOU SEEKING?  YOU ARE WANTING A
23 VARIANCE.  I MEAN, YOU DON'T LIKE 960 YEARS.  BUT --
24       MR. REID:  SPECIFICALLY, WE THINK, YOUR HONOR,
25 SOMETHING WITHIN THE STATUTORY RANGE.  WE WOULD SEEK

1  SOMETHING AT THE LOW END OF THE STATUTORY RANGE WITH
2  COUNTS TO RUN CONCURRENT WITH ONE ANOTHER AS OPPOSED TO
3  CONSECUTIVE.  THE ARGUMENT FOR CONCURRENCY, YOUR HONOR, I
4  THINK IS WHEN YOU LOOK AT, AND WE'LL SPEAK MORE TO THIS IN
5  MITIGATION, WHEN YOU LOOK AT THE LIFETIME OF THE DEFENDANT
6  FOR 33 YEARS, HE IS A SOLID CITIZEN, HAS NO RECORD,
7  TESTIMONY OF DR. PRESTON TON THE PRESENTENCE REPORT ITSELF
8  SAYS UNREMARKABLE, NOTHING FOR 33 YEARS.

9       FOR A BRIEF PERIOD OF TIME, NOT OFFERING EXCUSES
10 FOR ANY OF THE CONDUCT, BUT FOR THOSE MONTHS THERE THAT
11 THESE ACTIONS TOOK PLACE, THAT'S THE ONLY ENCOUNTER THAT
12 THIS INDIVIDUAL HAS HAD WITH LAW ENFORCEMENT IN HIS
13 LIFETIME FOR WHATEVER REASON, WHETHER IT BE DRUG ABUSE OR
14 THESE CHARGES WE ARE HERE ON TODAY.  I THINK FOR THAT
15 REASON, YOUR HONOR, BECAUSE THEY OCCURRED WITHIN A
16 RELATIVELY NARROW PERIOD OF TIME, TAKING INTO
17 CONSIDERATION THE LIFETIME THAT CONCURRENCY WOULD NOT BE
18 INAPPROPRIATE IN THIS CASE.

19      NOW, ALSO THINGS THAT WE'LL SPEAK TO IN
20 MITIGATION BUT ALSO HE HAS ACCEPTED RESPONSIBILITY, YOUR
21 HONOR.  HE HAS COME INTO COURT, HE SAID I DID IT, HE
22 DIDN'T PUT THE GOVERNMENT TO THE TEST OF A TRIAL, DIDN'T
23 PUT THESE VICTIMS TO THE TEST OF A TRIAL.  HE HAS COME IN
24 HERE AND ACCEPTED RESPONSIBILITY FOR THAT.  WHILE THE
25 PRESENTENCE REPORT DOES MAKE SOME ATTEMPT AT SOMETHING FOR

1 ACCEPTANCE OF RESPONSIBILITY, I THINK THAT THAT IS NOT

2 ENOUGH IN CONSIDERATION OF THE STATUTORY GUIDELINES THAT

3 ARE SET OUT THERE AND WE WOULD SEEK THE VARIANCE WITHIN

4 THE STATUTORY RANGE WITH THE COUNTS TO RUN CONCURRENT IS

5 WHAT WE WOULD ASK FOR SPECIFICALLY IN OUR REQUEST FOR A

6 VARIANCE.

7            THE COURT:  ALL RIGHT.  LET'S SEE, MR. FALGOUT,

8 ANYTHING YOU WOULD LIKE TO SAY IN MITIGATION OR OTHERWISE

9 BEFORE I PRONOUNCE SENTENCE?  DID YOU WANT TO PRESENT SOME

10 OTHER INFORMATION?

11            MR. REID:  WE HAVE OTHER MITIGATING INFORMATION.

12 I WAS JUST SPEAKING TO THE MOTION FOR VARIANCE.

13            THE COURT:  YOU MAY PROCEED.

14            MR. REID:  YOUR HONOR, FIRST I WOULD LIKE TO HAVE

15 SHERIFF PERKINS, LARRY PERKINS, THE SHERIFF OF LAMAR

16 COUNTY, COME FORWARD.

17            THE COURT:  CAN YOU JUST, THESE ARE NOT

18 PRESENTING TESTIMONY SO MUCH AS ALLOCUTION TYPE ARGUMENTS,

19 CORRECT?

20            MR. REID:  ALLOCUTION TYPE ARGUMENT.  SHERIFF

21 PERKINS IS FAMILIAR WITH THE FAMILY, FAMILIAR WITH MR.

22 FALGOUT, FAMILIAR WITH THE INVESTIGATION OF WHAT

23 OCCURRED.  HIS AGENCY IS THE ONE THAT INITIATED THE

24 INVESTIGATION, AND I THINK HE CAN SPEAK TO THE OVERALL

25 SCOPE OF WHAT HAS HAPPENED AND WHAT WE ARE HERE FOR TODAY.

```
 1              THE COURT:  OKAY.  SHERIFF.  AND I DID RECEIVE A
 2  LETTER FROM YOU; IS THAT CORRECT.
 3              SHERIFF PERKINS:  YES.
 4              THE COURT:  FEBRUARY 8, 2008, YOU SENT ME A
 5  LETTER.
 6              SHERIFF PERKINS:  YES.
 7          MR. REID:  IT'S INCLUDED IN OUR INFORMATION.
 8              THE COURT:  I HAVE GOT IT.  YOU MAY
 9  PROCEED, SIR.
10              SHERIFF PERKINS:  I JUST WROTE THE LETTER
11  TO REALLY, I GUESS, MR. AND MS. FALGOUT WAS COOPERATIVE IN
12  THE INVESTIGATION.  WE SEARCHED THEIR HOME ON TWO
13  DIFFERENT OCCASIONS WITHOUT A SEARCH WARRANT.  BASICALLY,
14  THAT'S WHAT THE LETTER WAS WRITTEN FOR.
15          THE COURT:  RIGHT.  ANYTHING ELSE YOU WOULD LIKE
16  TO SAY, SIR?
17              SHERIFF PERKINS:  I DON'T THINK SO.
18          THE COURT:  ALL RIGHT.  THANK YOU.
19          MS. BURRELL:  YOUR HONOR, CAN I HAVE HIM SWORN IN
20  AND PUT ON THE STAND SO I CAN CROSS EXAMINE HIM?
21              THE COURT:  HE HAS NOT REALLY PRESENTED
22  EVIDENCE.
23          MS. BURRELL:  I WANT TO ASK HIM ABOUT THE
24  EVIDENCE, PLEASE.
25          THE COURT:  ALL RIGHT.  SHERIFF, WOULD YOU COME
```

1    OVER TO THE WITNESS BOX, PLEASE?

2               SHERIFF TERRY PERKINS, SWORN

3          THE CLERK:  PLEASE STATE YOUR NAME.

4               THE WITNESS:  TERRY PERKINS.

5               THE CLERK:  PLEASE SPELL YOUR NAME.

6               THE WITNESS:  T-E-R-R-Y P-E-R-K-I-N-S.

7               THE CLERK:  IN WHAT CITY AND STATE DO YOU

8    RESIDE?

9               THE WITNESS:  VERNON, ALABAMA.

10          DIRECT EXAMINATION BY MS. BURRELL:

11     Q.   SHERIFF PERKINS, MY NAME IS MARY STUART BURRELL

12   AND I BELIEVE WE HAVE TALKED ON THE PHONE BEFORE; IS THAT

13   CORRECT?

14     A.   CORRECT.

15     Q.   I AM GOING TO SHOW YOU WHAT'S PREVIOUSLY BEEN

16   MARKED GOVERNMENT'S EXHIBIT 40 AND I WILL ASK YOU TO SEE

17   IF YOU RECOGNIZE THAT PLAINTIFF'S EXHIBIT?

18     A.   YES.

19     Q.   IS THIS THE LETTER THAT YOU AND THE JUDGE WERE

20   JUST CONVERSING ABOUT THAT THE JUDGE HAS A COPY OF IN HIS

21   FILE?

22     A.   YES.

23          MS. BURRELL:  YOUR HONOR, WE WOULD OFFER

24   INTO EVIDENCE GOVERNMENT'S EXHIBIT 40.

25          THE COURT:  ALL RIGHT.  IT'S RECEIVED WITHOUT

1    OBJECTION SINCE THE DEFENDANT PROVIDED IT TO ME INITIALLY.

2          MR. REID:  THAT'S CORRECT, YOUR HONOR.

3      Q.   SHERIFF PERKINS, WHAT ARE YOU TELLING THE JUDGE

4    ABOUT WHY YOU WROTE THIS LETTER?  HOW DID THIS LETTER COME

5    ABOUT?

6      A.   WELL, IT JUST -- I GUESS FEELINGS FOR MR. AND MS.

7    FALGOUT.

8      Q.   DID YOU JUST ON YOUR OWN DECIDE THAT YOU WOULD

9    WRITE THIS LETTER?

10     A.   NO, THERE WAS A GOOD BIT OF TALKING ABOUT IT.

11     Q.   WHO ASKED YOU TO WRITE THE LETTER?

12     A.   I THINK MAYBE MR. AND MS. FALGOUT -- MR. FALGOUT

13   MAYBE.

14     Q.   WELL, AS A MATTER OF FACT, YOU DIDN'T EVEN WRITE

15   THE LETTER DID YOU?

16     A.   NO, I DID NOT.

17     Q.   OKAY.  AND YOU HAVE NO -- YOU DID NOT WRITE THAT

18   LETTER BECAUSE YOU THINK THAT MR. FALGOUT, THIS MR.

19   FALGOUT DESERVES SOME KIND OF BREAK IN HIS SENTENCE, DID

20   YOU?

21     A.   NO.

22     Q.   YOU DIDN'T, RIGHT?

23     A.   NO.

24     Q.   YOU WROTE THE LETTER BECAUSE YOU HAPPEN TO KNOW

25   HIS MOTHER AND DADDY AND YOU LIKE HIS MOTHER AND DADDY,

1    AND FOR NO OTHER REASON; IS THAT RIGHT?

2         A.   THAT'S RIGHT.

3         Q.   AND I KEEP ON REFERRING TO THE LETTER AS IF YOU

4    WROTE IT.  AGAIN, YOU DIDN'T EVEN WRITE IT, DID YOU?

5         A.   I DID NOT MYSELF.

6              MS. BURRELL:  THAT'S ALL WE HAVE, YOUR

7    HONOR.

8              THE COURT:  ALL RIGHT.  ANYTHING IN FOLLOW UP.

9              CROSS EXAMINATION BY MR. REID:

10        Q.   WHO WROTE THE LETTER?

11        A.   OFFICER GOTTWALD.

12        Q.   DID YOU READ THE LETTER BEFORE YOU SIGNED IT?

13        A.   I SURE DID.

14        Q.   AND DID YOU DISAGREE WITH THE LETTER IN

15   PRINCIPLE?

16        A.   NO.

17        Q.   AND THE LAST SENTENCE OF THE LETTER IT SAYS I

18   WOULD HOPE THAT MY SON WOULD BE ABLE TO ONE DAY WALK FREE

19   PRIOR TO HIS DEATH.  DID YOU MEAN THAT STATEMENT WHEN YOU

20   WROTE IT, WHEN YOU SIGNED THE LETTER?

21        A.   YES.

22        Q.   EVEN THOUGH YOU DIDN'T WRITE IT?  DO YOU HAVE AN

23   OPINION ABOUT THE SENTENCE IN THIS CASE OR WHAT OUT TO BE

24   IMPOSED?

25        A.   I DON'T.

Case 6:12-cv-00037-RDP-PHE Document 64 Filed 09/07/10 Page 47 of 87
Case 6:12-cv-00037-RDP-PHE Document 64 Filed 09/07/08 Page 47 of 86

47

1        MS. BURRELL:  YOUR HONOR, WE OBJECT TO HIS

2  OPINION ABOUT WHAT SENTENCE OUGHT TO BE IMPOSED, IT'S

3  IRRELEVANT.

4        THE COURT:  WELL, YOU INTRODUCED THE LETTER AND

5  THAT STATEMENT'S IN THE LETTER.  JUST ASK HIM TO EXPLAIN

6  WHY HE MADE IT.

7        MS. BURRELL:  OKAY.

8        THE WITNESS:  WELL, YOU KNOW, SOMETIME, I GUESS,

9  BE RELEASED PRIOR TO HIS DEATH.

10       Q.  LET ME ASK YOU A LITTLE MORE DIRECTLY, SHERIFF.

11  DO YOU THINK A LIFE SENTENCE IS APPROPRIATE IN THIS CASE

12  BASED ON WHAT YOU WROTE IN THIS LETTER?

13       A.  I REALLY DON'T KNOW.

14           MR. REID:  NO FURTHER QUESTIONS.

15       REDIRECT EXAMINATION BY MS. BURRELL:

16       Q.  SHERIFF PERKINS, DID YOU AND I NOT HAVE A

17  CONVERSATION EARLIER THIS WEEK?

18       A.  YES, SIR.

19       Q.  AND DID I NOT SPECIFICALLY ASK YOU IF YOU THOUGHT

20  A LIFE SENTENCE WAS APPROPRIATE IN THIS CASE AND YOU TOLD

21  ME YES, MA'AM, I DO?  AND YOU WENT ON TO TELL ME THAT THIS

22  VIDEOTAPE, IT WAS WORST ONE OF THE WORST THINGS YOU HAVE

23  EVER SEEN.  DID YOU NOT TELL ME THAT?

24       A.  IT IS THE WORST ONE I HAVE EVER SEEN.

25       Q.  AND THIS LAST SENTENCE IN HERE JUST SAYS IF THE

1   ROLES WERE REVERSED AND I WAS FACING WHAT MR. AND MS.

2   FALGOUT, THE MOTHER AND DADDY ARE FACED WITH, I WOULD HOPE

3   THAT MY SON WOULD BE ABLE TO ONE DAY WALK FREE PRIOR TO

4   HIS DEATH.  I MEAN, ALL MOMMAS AND DADDIES LOVE THEIR

5   KIDS, DON'T THEY?

6       A.   SURE.

7       Q.   AND ALL MOMMAS AND DADDIES WOULD HATE TO SEE

8   THEIR CHILD DIE IN THE PENITENTIARY, WOULDN'T THEY?

9       A.   THAT'S CORRECT.

10      Q.   AND THAT'S ALL YOU ARE SAYING IN THIS LETTER; IS

11  THAT CORRECT?

12      A.   THAT'S RIGHT.

13              MS. BURRELL:  THAT'S ALL, YOUR HONOR.

14          THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN, UNLESS

15  THERE IS REBUTTAL QUESTIONS.

16          MR. REID:  NO, YOUR HONOR.

17          THE COURT:  YOU MAY STEP DOWN.  ALL RIGHT.  MR.

18  REID.

19          MR. REID:  I WOULD CALL MARTY GOTTWALD TO THE

20  STAND.

21              AGENT MARTIN GOTTWALD, SWORN.

22          THE CLERK:  BE SEATED PLEASE.  PLEASE STATE YOUR

23  NAME.

24          THE WITNESS:  MARTIN H. GOTTWALD.

25          THE CLERK:  PLEASE SPELL YOUR NAME.

```
 1                  THE WITNESS:  M-A-R-T-I-N, H.,

 2   G-O-T-T-W-A-L-D.

 3                  THE CLERK:  IN WHAT CITY AND STATE DO YOU

 4   RESIDE?

 5                  THE WITNESS:  KENNEDY, ALABAMA.

 6             DIRECT EXAMINATION BY MR. REID:

 7        Q.   AGENT GOTTWALD, HOW ARE YOU INVOLVED IN THIS

 8   CASE?

 9        A.   I WAS THE PRIMARY INVESTIGATOR.

10        Q.   WERE YOU THE INITIAL INVESTIGATOR ON THE CASE?

11        A.   YES.

12        Q.   AND WERE YOU THE, IT WAS YOUR PRIMARY

13   RESPONSIBILITY FOR THE INVESTIGATION AND DISCOVERY IN THIS

14   CASE?

15        A.   WITHIN THE SHERIFF'S DEPARTMENT, YES.

16        Q.   NOW, YOU HAVE HEARD SOME, YOU HAVE BEEN SITTING

17   IN THE COURTROOM, YOU HAVE HEARD SOME MENTION TO A LETTER

18   THAT WAS SIGNED BY SHERIFF PERKINS AND SOME REFERENCE WAS

19   MADE THAT YOU SIGNED THAT LETTER; IS THAT CORRECT?  OR YOU

20   WROTE THE LETTER; IS THAT CORRECT?

21        A.   I DID.

22        Q.   DID YOU PUT IN THE LETTER WHAT YOU BELIEVE?

23        A.   A LOT OF MY FEELINGS WENT IN IT, YES.

24        Q.   DO YOU HAVE ANY SPECIFIC FEELINGS ABOUT THIS

25   CASE?
```

1          MS. BURRELL:  YOUR HONOR, I OBJECT TO THE WAY
2    THAT THAT QUESTION WAS ASKED, THE WAY THAT IT WAS PHRASED.
3          THE COURT:  I AM GOING TO SUSTAIN, ASK YOU TO
4    REPHRASE IT.
5      Q.  WHEN YOU WROTE THIS LETTER, DID YOU HAVE AN
6    OPINION ABOUT A SPECIFIC SENTENCE IN THIS CASE?
7      A.  NOT SPECIFICALLY, NO.
8      Q.  DO YOU BELIEVE A LIFE SENTENCE IS APPROPRIATE IN
9    THIS CASE?
10     A.  I HAVE MIXED EMOTIONS ABOUT THIS CASE.  IT'S BEEN
11   VERY DIFFICULT ON ME AS WELL.  IT IS ONE OF THE MOST
12   HORRIBLE I HAVE EVER WORKED BUT I DO HAVE SOME
13   CONSIDERATION FOR MR. AND MS. FALGOUT WHO COOPERATED WITH
14   ME.  IT'S HARD FOR ME TO SAY.
15     Q.  WAS PIERRE FALGOUT COOPERATIVE WITH YOU?
16     A.  HE DID PROVIDE A STATEMENT.
17     Q.  HAS HE EVER DENIED TO YOU THAT HE WAS, HE DID
18   THIS?
19     A.  HE WAS EVASIVE, YES.  AS FAR AS WHEN WE STARTED
20   THE STATEMENTS, THAT'S CORRECT.
21     Q.  DID HE END UP GIVING A TRUTHFUL STATEMENT?
22     A.  HE ADMITTED THAT HE WAS, HAD TAPED SOME ACTIVITY
23   WITH THE CHILD, BUT I THINK HE HAD STATED THAT IT WAS
24   INVOLVED WITH HIM BEING ON A SIT AND SPIN, THOUGH THAT WAS
25   NOT TRUE.

1    Q.  DID YOU INVESTIGATE HIM FOR DRUG ABUSE, TOO, OR

2  DRUG CHARGES?

3    A.  I AM AWARE OF THOSE CHARGES BUT, NO, I AM NOT THE

4  PRIMARY NARCOTICS OFFICER.

5    Q.  IS HE THE ONLY INDIVIDUAL YOU INVESTIGATED IN

6  RELATION TO THIS CASE?

7    A.  WE ARE POTENTIALLY LOOKING AT ONE OTHER ONE.

8         MR. REID:  NO FURTHER QUESTIONS.

9         MS. BURRELL:  I DON'T HAVE ANYTHING OF THIS

10  WITNESS, YOUR HONOR.

11         THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

12         ALL RIGHT.  MR. REID.

13         MR. REID:  YOUR HONOR, WHAT I HAVE LEFT IN

14  MITIGATION IS I HAVE THREE FAMILY MEMBERS THAT ARE HERE

15  WHO WOULD LIKE TO SPEAK ON BEHALF OF MR. FALGOUT.

16         THE COURT:  I WOULD BE GLAD TO HEAR THEM.

17         MR. REID:  THEN MR. FALGOUT WOULD LIKE TO

18  SPEAK AND I WOULD LIKE TO MAKE SOME REMARKS IN SUMMATION.

19         THE COURT:  WE'LL PROCEED ACCORDINGLY.

20         MR. REID:  I WOULD CALL MARY BLACKWELL, THE AUNT

21  TO PIERRE FALGOUT.

22         THE COURT:  SHE CAN JUST COME TO THE MICROPHONE

23  RATHER THAN THE WITNESS STAND.  I TAKE IT THIS IS JUST A

24  PLEA ON BEHALF OF THE DEFENDANT?

25         MR. REID:  THAT'S CORRECT.

1  MS. BLACKWELL:  MY NAME IS MARY BLACKWELL,

2  I AM PIERRE'S AUNT.  I AM HIS MOTHER'S SISTER.  AND I JUST

3  WANTED TO STATE THAT WE DO HAVE SOME CASES, A HISTORY IN

4  OUR FAMILY OF DEPRESSION, EVEN WITHIN MY IMMEDIATE

5  FAMILY.  AND THAT I JUST WOULD ASK FOR LENIENCY AND

6  HOPEFULLY TREATMENT AND REHABILITATION FOR PIERRE.

7  THE COURT:  THANK YOU.

8  MR. REID:  NEXT I WOULD CALL PETE FALGOUT,

9  PIERRE'S FATHER.

10  THE COURT:  WELCOME, MR. FALGOUT.

11  MR. PETE FALGOUT:  THANK YOU, SIR.  I KNOW

12  MY SON HAS DONE WRONG BUT I HAVE SEEN THE TAPES, I HAVE

13  SEEN THE FILMS.  AND THE DAY THAT MR. GOTTWALD SHOWED THEM

14  TO ME, I COULD HAVE TOOK MY OWN SON'S LIFE, AND IT STILL

15  UPSETS ME TODAY.  BUT WHEN WE LOOK BACK AT IT AND YOU CAN

16  PUT THE PICTURES TOGETHER, JUST LIKE MARTY SAID, HE HAS

17  MIXED FEELINGS, THERE IS MORE GOING ON IN THIS CASE, IN

18  OTHER CASES THAT SURROUND HIM THAT'S NOT HERE TODAY TO

19  GIVE HIM JUSTIFICATION BECAUSE EVERYTHING'S BEING DROPPED

20  ON HIM.

21  I ASK FOR, BECAUSE OF THE DEPRESSION, THE

22  PERSON AT MARATHON THAT GAVE HIM THE DRUGS TO GET HIM

23  THROUGH TODAY, MY SON TOOK OFF ON IT LIKE A SKY ROCKET.

24  HE HAS NEVER BEEN, HE HAS NEVER DRANK, HE HAS NEVER SMOKED

25  MARIJUANA, HE DOESN'T SMOKE CIGARETTES, IT JUST TOOK A

1   HOLD OF HIM AND HE WENT THERE.  WHY HE WENT WITH IT, IT
2   WAS INTRODUCED TO HIM JUST TO GET HIM THROUGH THE DAY.
3   THAT'S LIKE GIVING SOMEBODY AN ENERGY DRINK, YOU KNOW,
4   NEXT THING YOU KNOW YOU GOT TO HAVE TWO OF THEM, YOU HAVE
5   GOT TO HAVE THREE OF THEM.  NEXT THING, YOUR WHOLE MIND IS
6   NOT THINKING.
7              AND I ASK FOR LENIENCY FROM THE COURT BECAUSE
8   THE DEPRESSION, AND HE DOESN'T DESERVE IT, HE HAS BEEN A
9   GOOD YOUNG MAN FOR 33 YEARS AND SOMETHING BROKE IN SIX
10  MONTHS, AND IT CAN BE FIXED.  HE WAS A GOOD WORKER,
11  EMPLOYEE OF THE MONTH, EMPLOYEE OF THE YEAR, HE GOT AWARDS
12  FOR ATTENDANCE.  SOMETHING BROKE, AND IT CAN BE FIXED,
13  YOUR HONOR, AND HE CAN RETURN TO SOCIETY.  THANK YOU.
14             THE COURT:  THANK YOU.
15             MR. REID:  CALL SANDRA FALGOUT, PIERRE'S MOTHER.
16             THE COURT:  THANK YOU FOR COMING, MS. FALGOUT.
17             MS. SANDRA FALGOUT:  THANK YOU.  I AM
18  SANDRA FALGOUT; I AM PIERRE'S MOTHER.  GARY WAS MY FIRST
19  BORN CHILD.  WE HAVE ALWAYS BEEN REAL CLOSE.  I DON'T
20  KNOW, HE IS A GOOD PERSON, HE IS GOOD HEARTED, HE GOT
21  ALONG WELL WITH OTHER PEOPLE.  HE HAS DONE WELL ALL OF HIS
22  LIFE.  IN PROBABLY THE PAST THREE YEARS WE SAW HIM GOING
23  DOWN, WE SAW THE DEPRESSION, AND IT TOOK US A WHILE TO
24  FIGURE OUT EXACTLY WHAT ALL WAS GOING ON IN HIS MIND.
25             I HAVE BEEN TO HIS HOUSE ON THREE DIFFERENT

1 OCCASIONS, SUSPECTING TO FIND HIM DEAD, SUSPECTING HIM TO

2 HAVE COMMITTED SUICIDE. HE REALLY WOULDN'T ACCEPT A WHOLE

3 LOT OF HELP FROM US. I HAVE SUFFERED FROM DEPRESSION FOR

4 THE LAST 20 SOME-ODD YEARS. I KNOW HOW DEVASTATING THAT

5 CAN BE ON SOMEBODY. I THINK PIERRE FOUND A WAY TO MAKE

6 HIMSELF FEEL BETTER BY USING THE DRUGS.

7          AND WHAT HE HAS DONE IS HORRIBLE AND I AM NOT

8 MAKING EXCUSES FOR HIM, BUT I FEEL LIKE THERE IS AN

9 EXPLANATION FOR IT. AND I DON'T WANT HIM TO SPEND THE

10 REST OF HIS LIFE IN PRISON. WE, ALL OF HIS FAMILY, LOVE

11 HIM VERY MUCH AND WE WANT HIM TO BE ABLE TO COME HOME TO

12 US ONE DAY. THANK YOU.

13          THE COURT: THANK YOU.

14          MR. REID: YOUR HONOR, FINALLY, WE WOULD HAVE THE

15 DEFENDANT, PIERRE FALGOUT.

16          THE COURT: ALL RIGHT.

17          THE DEFENDANT: FROM THE DEEPEST DEPTHS OF MY

18 HEART, I AM TRULY SORRY FOR THE VICTIMS, THE VICTIMS'

19 FAMILIES, MY FAMILY, EVERYONE IN THIS COURTROOM TODAY FOR

20 THE THINGS THAT I HAVE DONE.

21          I HAVE ALWAYS, FROM THE START OF THIS, ADMITTED

22 TO AND OWNED UP TO WHAT I HAVE DONE. AND AT THE TIME OF

23 THE OCCURRENCE, I REALLY DON'T KNOW IF I KNEW RIGHT FROM

24 WRONG SO MUCH AS THE FACT THAT I DIDN'T CARE. AND NOT

25 CARING FOR MY OWN LIFE MAKES ME IN NO SHAPE TO CARE FOR

Case 6:12-cv-08037-RDP-PRA Document 64 Filed 09/17/13 Page 55 of 86

1   THE WELL BEING OF ANY OTHERS.  BUT NOW THAT I CAN LOOK

2   BACK ON THINGS, I KNOW WHAT I DONE WAS VERY WRONG, AND I

3   CARE VERY MUCH SO FOR EVERYBODY INVOLVED IN IT.

4         I DON'T KNOW EXACTLY, 33 YEARS I NEVER HAD ANY

5   KIND OF EPISODES, YOU KNOW, OR PICTURES OR ANYTHING LIKE

6   THAT THAT WENT OUTSIDE THAT TIME ZONE IN MY LIFE.  AND I

7   MEAN, THAT'S A PERSON THAT I WASN'T AND I'M THANKFUL FOR

8   MARTY AND SHERIFF PERKINS FOR ARRESTING THAT PERSON AND

9   STOPPING THAT PERSON BEFORE SOMETHING HAPPENED THAT WAS

10   ANY, THAT WAS ANY WORSE THAN EVERYTHING THAT ALREADY HAS

11   HAPPENED.  AND I AM NOT MAKING EXCUSES FOR WHAT HAPPENED,

12   I JUST HOPE THAT PEOPLE CAN SEE THE WHOLE LIFE OF ME AND

13   NOT JUST REFER TO THE EIGHT MONTHS THAT THE OCCURRENCE

14   HAPPENED.  AND NOT MAKING NO, KIND OF PUTTING OFF ON ANY

15   KIND OF ANYBODY ELSE, BUT LIKE MY FATHER SAID, YOU KNOW, I

16   AM OUT OF THESE CHILDREN'S LIVES, MAYBE FOREVER OUT OF

17   SOCIETY.  BUT THE MOTHERS OF THESE CHILDREN I WAS INVOLVED

18   WITH, AND IF THE COURT, IF THE PEOPLE ARE LOOKING TO SEE

19   THE RIGHT THING FOR THE CHILDREN, THEY NEED TO LOOK INTO

20   THE SITUATION A LITTLE BIT DEEPER BECAUSE IT WAS SOMETHING

21   THAT WASN'T JUST, YOU KNOW IT WASN'T SOMETHING THEY JUST

22   DIDN'T KNOW ABOUT.  IT WASN'T I WAS STEALING KIDS FROM

23   WALMART AND BRINGING THEM BACK TO MY HOUSE AND DOING THESE

24   THINGS TO THEM, THEY WERE PEOPLE THAT I WAS SLEEPING WITH

25   THEIR MOTHERS AND DOING DRUGS WITH THEM AND THEY WERE IN

1  MY, IN MY LIFE FOR A SHORT PERIOD OF TIME.

2          I JUST, I HOPE THAT THE COURT SEES THAT AND

3  HOPEFULLY ONE DAY I CAN RETURN TO SOCIETY AND FINISH

4  FULFILLING MY LIFE LIKE I WAS DOING BEFORE ALL THIS

5  HAPPENED.  AND THE SEXUAL, ALL THE SEXUALNESS IN IT, I

6  DON'T HAVE SEXUAL TENDENCIES FOR CHILDREN.  AND I CAN'T

7  EXPLAIN AND I CAN'T MAKE REASONS AND I AIN'T MAKING

8  EXCUSES FOR WHAT I DONE.  I DON'T KNOW WHAT WAS GOING ON

9  IN MY LIFE TO MAKE ME DO THEM THINGS, AND I HOPE THE COURT

10  CAN SEE THAT AND JUST HAVE SOME MERCY ON ME.

11          THAT'S ALL I HAVE TO SAY, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT,

13  MR. REID.

14          MR. REID:  YOUR HONOR, FIRST I WILL SAY ON BEHALF

15  OF PIERRE FALGOUT AND HIS FAMILY AND REPRESENTING HIM THAT

16  NOBODY WHO TESTIFIED HERE TODAY IN ANY WAY IS TRYING TO

17  MAKE AN EXCUSE FOR WHAT HAPPENED, TRY TO DIMINISH WHAT

18  HAPPENED, TRY TO SAY THAT IT'S ANY LESS THAN WHAT IT IS.

19  IT'S BAD, AND WE SAY THAT UP FRONT.

20          YOUR HONOR, WHEN YOU LOOK AT THIS, I THINK YOU

21  HAVE TO LOOK AT PIERRE FALGOUT IN THE TOTALITY OF HIS

22  LIFE.  HE STANDS HERE TODAY 35, ALMOST 36 YEARS OLD, AND

23  FOR 33 YEARS WAS A SOLID CITIZEN.  SOMETHING HAPPENED.  IN

24  LOOKING AT THIS CASE, I HAVE SEARCHED FOR AN EXPLANATION

25  AS TO WHY.  I HAVE NOT FOUND ONE.  I CAN'T SAY WHY THIS

1  HAPPENED, I CAN'T SAY WHAT TRANSPIRED.  I KNOW THAT THERE
2  WERE DRUGS INVOLVED, MENTAL HEALTH ISSUES INVOLVED.  YOU
3  HAVE VICTIM IMPACT LETTERS FROM MOTHERS OF THESE CHILDREN.
4  THEY ARE MOTHERS WHO WERE INVOLVED WITH MR. FALGOUT IN
5  USING ILLEGAL DRUGS, BRINGING THESE CHILDREN INTO THAT
6  ENVIRONMENT.

7          DOES THAT EXCUSE IT?  NO, SIR, NOT AT ALL.  IT
8  DOESN'T BEGIN TO EXCUSE IT.  THESE WERE HELPLESS CHILDREN,
9  INNOCENT VICTIMS.  WHAT'S DONE IS DONE.  WHAT WE LOOK AT
10 HERE TODAY AND WHAT I WOULD ASK THE COURT TO LOOK AT IS,
11 IS THERE ANY HOPE?  CERTAINLY FOR THE VICTIMS, YOU HAVE
12 SEEN THAT THEY ARE RECEIVING COUNSELING AND IT'S SAD THAT
13 THEY HAVE TO RECEIVE IT.  IT'S SAD THAT THIS EVENT
14 HAPPENED AND IT'S SAD THAT THESE THINGS TOOK PLACE AND
15 STOLE SOME OF THE INNOCENCE OF YOUTH, BUT IT HAS.  THERE
16 IS HOPE FOR THESE VICTIMS.  THERE IS HOPE THAT THEY CAN
17 RECEIVE COUNSELING, THAT THEY CAN RECEIVE TREATMENT, THAT
18 THEY CAN GO FORWARD AND THAT THEY CAN HOPEFULLY, ONE DAY,
19 NOT BECOME COMPLETELY WHOLE AGAIN BECAUSE I DON'T THINK
20 THAT THEY WILL, BUT I THINK THAT ONE DAY THEY CAN LEAD
21 PRODUCTIVE LIVES.  THERE IS HOPE.  THERE IS HOPE FOR THESE
22 VICTIMS.  THERE IS HOPE FOR THESE FAMILIES.

23          AND WHAT WE ARE DEALING WITH HERE TODAY IS PIERRE
24 FALGOUT AND WHAT KIND OF A SENTENCE HE SHOULD BE IMPOSED
25 WITH, AND WHAT IS JUST AND WHAT IS RIGHT IN THIS CASE AND

WHAT WE HAVE TO LOOK AT IS THERE ANY HOPE FOR HIM?  IF THE
COURT SO DESIRES, IT CAN IMPOSE UPON HIM WHAT IS THE
EQUIVALENT OF WHAT IS A LIFE SENTENCE AND SEND HIM TO BE
INCARCERATED FROM NOW AND FOR THE REST OF HIS NATURAL
LIFE.  AND I THINK IN SAYING THAT, YOUR HONOR, WE WOULD BE
MAKING A MISTAKE THAT THERE IS NO HOPE FOR HIM.  WHAT IS
DONE IS BEYOND RECONCILIATION, BEYOND RECOVERY AND BEYOND
ANY HOPE.

           BUT I THINK IF WE HAD DONE ANYTHING HERE TODAY,
YOUR HONOR, HOPEFULLY WE HAVE RELAYED TO THE COURT JUST A
LITTLE BIT THAT THERE IS HOPE, THAT FOR 33 YEARS THIS
PERSON WAS A SOLID CITIZEN.  HE BECAME ENGAGED, HE WORKED
AT A JOB, HE PURCHASED A HOME, HE BECAME A MODEL EMPLOYEE,
HE BECAME PROMOTED WITHIN HIS JOB.  HE HAD ALL THE
TRAPPINGS OF WHAT WOULD BE THE SUCCESSFUL, NORMAL LIFE.
NOW, WE CAN KIND OF DIMINISH IT BY SAYING THAT EVERYBODY
HAS EVENTS IN THEIR LIVES, EVERYBODY HAS STRESSORS,
EVERYBODY REACTS TO THEM DIFFERENTLY, AND THAT'S TRUE.
AND THAT'S IN NO WAY AN EXCUSE FOR WHAT HAPPENED.  BUT
MAYBE IT'S SOME EXPLANATION BECAUSE YOU TAKE MENTAL HEALTH
ISSUES ALONG WITH DRUG ABUSE AND ALONG WITH THE
RELATIONSHIPS BETWEEN HE AND THESE CHILDREN'S MOTHERS AND
IT CREATES A RECIPE FOR A DISASTER, A DISASTER THAT
HAPPENED, AND IT HAPPENED AND WE CAN'T GO BACK AND ERASE
IT. BUT DOES IT MAKE THIS SITUATION HOPELESS?  AND I THINK

1  THAT IT DOES NOT.

2       HE HAS THE SUPPORT OF A STRONG AND GOOD FAMILY,

3  NUMEROUS MEMBERS WHO DID NOT SPEAK HERE TODAY BUT WHO ARE

4  HERE ON HIS BEHALF AND TO LEND SUPPORT FOR HIM.  HE IS NOT

5  BY HIMSELF IN THIS.  HE HAS BEEN COMMITTED BEFORE, AN

6  INVOLUNTARY COMMITMENT BY HIS FAMILY SEEKING OUT, TRYING

7  TO GET HELP FOR HIM.

8       IN THIS BRIEF -- AND ALTHOUGH IT ISN'T BRIEF, BUT

9  IN THIS PERIOD OF TIME OF HIS LIFE WHERE HE IS IN THIS

10  DOWNWARD SPIRAL, HIS FAMILY REALIZES THERE IS A NEED FOR

11  HELP.  HE GETS SOME MENTAL HEALTH TREATMENT BUT YET IT

12  DOESN'T FIX THE PROBLEM.  HE GETS INVOLVED IN ILLEGAL

13  DRUGS, VOLUNTARILY, AND CONTINUES.  AND I HAVE TO BELIEVE

14  FOR ONE, YOUR HONOR, THAT THE COMBINATION OF THOSE EVENTS

15  TOGETHER HAS SOME IMPACT AND SOME REASONING BEHIND THIS.

16       BUT IF WE SAY HE IS HOPELESS, IF WE SAY THERE IS

17  NO HOPE TO REHABILITATE, TO RECONCILE, TO ADDRESS THE

18  PROBLEMS AND THE ISSUES THAT HE HAS, THEN THERE IS A LIFE

19  SENTENCE.  BUT I BELIEVE, YOUR HONOR, AND I THINK IT'S

20  BORNE OUT THROUGH EVERYTHING THAT WE HAVE SUBMITTED,

21  WHETHER IT BE LETTERS FROM FAMILY MEMBERS, LETTERS FROM

22  ONE OF THE VICTIM, TWO OF THE VICTIMS' GRANDMOTHERS, KATHY

23  DODD IS IN THERE.  ALL OF THESE THINGS SPEAK TO THE FACT

24  THAT HE HAS SOME HOPE, THAT THERE IS HOPE FOR HIM.  THERE

25  IS HOPE TO BE REHABILITATED. DR. PRESTON TALKED ABOUT IT.

1  DR. PRESTON DIDN'T DIMINISH IN EITHER HIS DIRECT TESTIMONY

2  OR UNDER CROSS EXAMINATION, DIDN'T SAY THIS IS NOT AS BAD

3  AS IT SEEMS.  IT IS.  IT'S BAD.  WE HAVE SAID THAT, WE

4  HAVE ADMITTED THAT.

5       NOW, ALSO WE HAVE TO LOOK AT THAT PIERRE FALGOUT

6  ACCEPTED AND STANDS HERE TODAY AND STILL ACCEPTS

7  RESPONSIBILITY FOR WHAT HE HAS DONE.  HE HAS COME FORWARD.

8  HE HAS ENTERED A PLEA OF GUILTY, A BLIND PLEA WITH NO

9  OFFER OR NO KNOWLEDGE OF WHAT THE SENTENCE MIGHT BE.  HE

10 IS RELYING, LAYING HIMSELF COMPLETELY AT THE MERCY OF THE

11 COURT.  BUT IN THAT, SAYING THAT HE CAN ACCEPT

12 RESPONSIBILITY FOR WHAT HE HAS DONE, HE IS ASKING THE

13 COURT TO TAKE THAT INTO CONSIDERATION.  HE DIDN'T PUT ANY

14 OF THESE VICTIMS THROUGH THE PRESSURE OF A TRIAL.  HE

15 DIDN'T PUT THE STATE TO THE TEST OF A TRIAL.  BUT HE HAS

16 COME HERE TODAY, YOUR HONOR, ASKING FOR HOPE.  AND HE HAS

17 LAID HIMSELF ON THE MERCY OF THE COURT ASKING FOR HOPE.

18       ONE THING TO BRING OUT AND, AGAIN, THIS IS NOT IN

19 THE WAY OF AN EXCUSE IN ANY WAY, IF ALL OF THIS, AS BAD AS

20 IT IS, THERE IS NO EVIDENCE IN ANY OF THIS THAT MR.

21 FALGOUT SEXUALLY MOLESTED ANY OF THESE CHILDREN.  WHILE

22 THERE IS ABUSE IN THERE, IT'S NOT COMPLETELY OF A SEXUAL

23 NATURE.  THERE WAS NO SODOMY, NONE OF THE THINGS THAT WE

24 OFTEN SEE IN CASES SUCH AS THIS, IT'S NOT THERE.

25       THE FACT HAS BEEN MADE ONE OF THESE CHILDREN WERE

1  UNDER THE INFLUENCE OF A NARCOTIC DRUG.  WE DON'T DISPUTE

2  THAT.  WE HAVEN'T SAID THAT HE IS NOT UNDER THE INFLUENCE

3  OF ANYTHING.  BUT WHAT ALSO HAS NOT BEEN BROUGHT OUT IS

4  THERE HAS BEEN NO PROOF ELICITED FROM ANYONE AS TO SAY

5  WHERE THOSE NARCOTICS CAME FROM.  WHAT IS A FACT, WHAT

6  COULD BE BROUGHT OUT IN TESTIMONY IS THAT KATHY ALLEN,

7  DENISE WINDJOM, ALL OF THE MOTHERS OF THESE CHILDREN WERE

8  INVOLVED WITH PIERRE FALGOUT AND THEY WERE DRUG USERS.

9          THIS WAS, THIS IS HOW THEY BECAME IN A

10  RELATIONSHIP IN THE FIRST PLACE.

11          THE COURT:  HAVING SAID THAT THOUGH, IT'S

12  UNDISPUTED THAT IMMEDIATELY BEFORE THE CHILD WAS TAKEN TO

13  THE MEDICAL FACILITY AND ON TO THE HOSPITAL THE CHILD HAD

14  BEEN IN THE DEFENDANT'S CARE THAT MORNING; AM I RIGHT?

15          MR. REID:  WHATEVER THE RECORD -- WE WILL STAND

16  BEHIND THE RECORD, YOUR HONOR.

17          THE COURT:  THAT'S UNDISPUTED IN THE RECORD,

18  ISN'T IT?

19          MR. REID:  IN THE VIDEOTAPE, I DON'T KNOW WHAT

20  THE PROXIMITY OF -- THE STATEMENT WAS MADE THAT HE IS

21  UNDER THE INFLUENCE IN THE VIDEOTAPE, AND I DON'T KNOW HOW

22  SOON THAT --

23          THE COURT:  IN THE VIDEOTAPE HIS PUPILS WERE

24  DILATED IN THE CHILD, THE CHILD COULDN'T STAND UP, THE

25  CHILD WAS FALLING DOWN.

Case 6:12-cv-08037-RDP-PHT Document 4-4 Filed 09/b7/18 Page 62 of 87
Case 6:07-cv-00137-RDP-PRA Document 40 Filed 09/b7/08 Page 62 of 86

62

1    MR. REID:  THAT'S CORRECT.

2    THE COURT:  THE CHILD WAS IN DISTRESS.

3    MR. REID:  WHAT WE ARE SAYING IS THERE IS NO

4  EVIDENCE AS TO WHERE THOSE DRUGS CAME FROM, THAT THE CHILD

5  WAS UNDER THE INFLUENCE AT THAT TIME.

6    NOW, IN ALL OF THIS YOUR HONOR, ALL THINGS

7  CONSIDERED, WITH ISSUES OF DEPRESSION, ISSUES OF DRUG

8  ABUSE, IN ALL OF THIS, WHAT PIERRE FALGOUT HAS DONE IS HE

9  HAS ACCEPTED RESPONSIBILITY.  HE STANDS HERE TODAY, HE HAS

10  PLED GUILTY AND HE ASKS THE COURT TO TAKE ALL OF THAT INTO

11  CONSIDERATION.

12    YOU HAVE HEARD THE TESTIMONY OF THE LAW

13  ENFORCEMENT OFFICERS.  YOU HAVE HEARD HIS STATEMENT.  YOUR

14  HONOR, WE ARE NOT DIMINISHING IN ANY WAY HOW BAD THIS IS.

15  WE ARE NOT SAYING THAT IT'S SOMETHING THAT SHOULD BE

16  CONSIDERED LIGHTLY.  BUT AS WE HAVE ASKED FOR IN THE

17  MOTION FOR VARIANCE, WE WOULD ASK THE COURT SENTENCE HIM,

18  WE WOULD ASK THAT HE SENTENCE HIM AT THE LOW END OF THE

19  STATUTORY RANGE AND THAT ALL COUNTS BE RUN CONCURRENT.

20  THAT IN ITSELF, YOUR HONOR, WOULD BE A LENGTHY SENTENCE;

21  IT WOULD BE A LONG TIME.  IT WOULD DO A LOT OF THE THINGS

22  3553(A) REQUIRES.

23    PIERRE FALGOUT, A LIFE SENTENCE IS NOT GOING

24  TO PROMOTE ANY MORE RESPECT FOR THE LAW THAN IT HAS

25  ALREADY.  I THINK HIS RESPECT FOR THE LAW HAS BEEN

Case 6:07-cv-00037-RDP-PWG   Document 44   Filed 09/17/08   Page 63 of 86

1   DEMONSTRATED BY HIM COMING INTO THE COURT, ACCEPTING

2   RESPONSIBILITY FOR WHAT HE HAS DONE AND ENTERING A PLEA OF

3   GUILTY.  IT WOULD --

4        THE COURT:  IS IT ONLY THE DEFENDANT TO WHOM

5   RESPECT FOR THE LAW IS DIRECTED IN THIS SENTENCE OR IS IT

6   SOCIETY AS A WHOLE, TOO?

7         MR. REID:  I THINK IT'S BOTH, YOUR HONOR,

8   BUT I THINK SOCIETY AS A WHOLE UNDERSTANDS RESPECT FOR THE

9   LAW AND TAKES INTO ACCOUNT THINGS SUCH AS THIS.  I MEAN,

10   IN THE DISPARITY OF SENTENCES, YOUR HONOR, I DON'T THINK

11   THAT WE WOULD BE LOOKING AT ANY MORE SEVERE A SENTENCE IF

12   SOMEONE WERE ON TRIAL FOR MURDER.  I MEAN, THIS IS A

13   SENTENCE THAT IS THE EQUIVALENT OF A LIFE SENTENCE, IT IS

14   THE MOST SEVERE THE COURT CAN HAND OUT.  AND I THINK THAT

15   THE VERY NATURE AND RESPECT FOR THE LAW FOR SOCIETY AS A

16   WHOLE IS INTERTWINED INTO THAT.

17        I THINK THAT THE SENTENCE HAS TO BE, AS

18   3553(A) CALLS SUFFICIENT BUT NOT GREATER THAN NECESSARY.

19   AND JUST TO SUMMARIZE, YOUR HONOR, WE ASK YOU TO CONSIDER

20   HIM A HOPEFUL SITUATION, ONE FOR WHICH THERE IS HOPE AND

21   ONE FOR WHICH HE CAN, ONE DAY, AFTER THE SERVICE AND

22   IMPOSITIONING OF SENTENCE, THAT HE COULD RETURN TO

23   SOCIETY.

24        AND WHATEVER THE COURT DOES HERE TODAY, HE IS

25   NOT, THIS IS NOT THE END OF THE ROAD FOR HIM.  HE HAS

Case 6:07-cv-00037-RDP-PWG  Document 44  Filed 09/17/08  Page 64 of 86

1  OTHER CHARGES THAT HE IS FACING, ALTHOUGH WE ARE NOT

2  ASKING THE COURT TO TAKE THOSE INTO CONSIDERATION.  BUT WE

3  DO IT JUST TO SAY, YOUR HONOR, THAT HE FACES OTHER

4  CHARGES.  BUT WE WOULD ASK THIS COURT TO SENTENCE HIM IN A

5  MANNER WHERE HE DOES HAVE THE HOPE ONE DAY TO REHABILITATE

6  HIM AND RETURN TO SOCIETY.

7       THE COURT:  ALL RIGHT.  MS. BURRELL.

8       MS. BURRELL:  YOUR HONOR, THE GOVERNMENT FILED A

9  VERY LENGTHY SENTENCING MEMORANDUM AND I HOPE THE COURT'S

10  HAD A CHANCE TO READ THOSE.

11       THE COURT:  I HAVE REVIEWED IT.

12       MS. BURRELL:  WE HAVE MADE IT VERY CLEAR IN OUR

13  SENTENCING MEMORANDUM WHAT WE HOPE AND EXPECT THE SENTENCE

14  IN THIS CASE SHOULD BE, GIVEN THE CASE, IF YOU LOOK AT IT

15  IN RELATION TO THE 3553(A) FACTORS.

16       YOUR HONOR, I DO WANT TO MAKE ONE CORRECTION TO

17  MY SENTENCING MEMORANDUM.  ON PAGE FIVE, I PUT IN THERE

18  THAT FALGOUT'S CONDUCT WAS CHARACTERIZED BY EXTRAORDINARY

19  CRUELTY AND THE DURATION OF HIS CONDUCT FROM AS EARLY AS

20  JANUARY 31, 2004, AND CONTINUING UNTIL AS LATE AS NOVEMBER

21  29, 2006, MAKES A HARSH SENTENCE APPROPRIATE.  THAT'S ON

22  PAGE FIVE.

23       THE COURT:  I SEE THAT.

24       MS. BURRELL:  YOUR HONOR, I NEED TO CORRECT THAT

25  AND PUT IN THERE DECEMBER 31, 2004.  IF YOU COULD MAKE

1 THAT CORRECTION, PLEASE.

2          THE COURT:  ALL RIGHT.  THE RECORD WILL REFLECT

3 THAT THAT GOVERNMENT'S OFFERED THAT CORRECTION.  I WILL

4 ACCEPT THAT.

5          MS. BURRELL:  YOUR HONOR, WE THINK OUR ARGUMENTS

6 HAVE BEEN SUFFICIENTLY SET OUT IN OUR MEMO.  WE ARE ASKING

7 FOR A 960 YEAR SENTENCE.  I THINK THAT'S THE APPROPRIATE

8 SENTENCE GIVEN THE CONDUCT THAT THE DEFENDANT ENGAGED IN,

9 YOUR HONOR.  I HAVE HEARD NUMEROUS PEOPLE TODAY ASK FOR

10 CONCURRENT SENTENCES.  YOUR HONOR, THIS CASE DOESN'T CALL

11 FOR CONCURRENT SENTENCES.  THESE WERE NOT, THIS WAS NOT

12 THE SAME VICTIM AND THIS WAS, THESE WERE NOT CONCURRENT

13 INCIDENTS.  THESE ARE INCIDENTS THAT HAPPENED OVER A

14 PERIOD OF TIME, AND WE ARE NOT TALKING ABOUT JUST OVER A

15 PERIOD OF A WEEK.  THESE WERE EVERY TIME DURING THIS

16 PERIOD OF TIME HE HAD A NEW WOMAN MOVE IN OR, AS HE SAYS,

17 THAT HE STARTED SLEEPING WITH, THE CHILDREN OF THAT WOMAN

18 BECAME HIS VICTIMS.  THAT IS NOT THE KIND OF CASE WHEN YOU

19 HAVE A PROLONGED PERIOD OF TIME WITH MULTIPLE VICTIMS THAT

20 CALLS FOR A CONCURRENT SENTENCE.

21          YOUR HONOR, WE ALSO HAVE HEARD NUMEROUS PEOPLE

22 TODAY ASK FOR A LENIENT SENTENCE FOR MR. FALGOUT.  I

23 SUBMIT TO THE COURT TODAY THAT HE SHOWED HIS VICTIMS NO

24 LENIENCY.  AND FOR THAT REASON AND THE OTHER REASONS AS

25 SET OUT IN MY SENTENCING MEMORANDUM, WE ARE ASKING FOR THE

1 FULL SENTENCE AS CALLED UPON BY THE GUIDELINES.

2       THE COURT:  LET ME ASK YOU TWO THINGS THAT YOUR

3 COLLEAGUE BROUGHT UP IN SPEAKING ON BEHALF OF HIS CLIENT.

4 ONE, HOW DO YOU THINK I FACTOR IN HIS ARGUMENTS ABOUT HOPE

5 FOR THE DEFENDANT IN THESE 3553 FACTORS?  IN OTHER WORDS,

6 THE REHABILITATION POTENTIAL OF THE DEFENDANT.

7       MS. BURRELL:  I WAS ABOUT TO SAY I HAVE

8 NEVER SEEN THE WORD HOPE IN THE 3553(A) FACTORS BUT I

9 ASSUME WHAT HE MEANT WAS THE REHABILITATION.

10       THE COURT:  THAT'S RIGHT.

11       MS. BURRELL:  THE TRUTH OF THE MATTER IS

12 NOBODY KNOWS WHETHER OR NOT HE CAN BE REHABILITATED.

13       YOUR HONOR, IN THE LETTER THAT HE SUBMITTED

14 TO THE COURT, AND I DON'T HAVE IT HERE IN FRONT OF ME, BUT

15 BY HIS OWN ADMISSION HE TALKS ABOUT -- LET ME SEE IF I CAN

16 GET IT SO THAT I DON'T MISQUOTE THE LETTER.  HE TALKS

17 ABOUT HIS LIFE AND SOME THINGS THAT HAVE BEEN HAPPENING IN

18 HIS LIFE, AND HE SAYS THAT HE CLAIMS THAT HE WAS BIPOLAR

19 ALTHOUGH NOBODY HAS EVER SAID THAT HE WAS BIPOLAR.  BUT HE

20 SAYS IN THERE THAT THE WAY THAT HE FELT WAS THAT YOU GET

21 SAD, IF YOU ARE SAD YOU GET SADDER, IF YOU ARE MAD, YOU

22 GET MADDER.

23       YOUR HONOR, I MEAN, I THINK YOU COULD SAY

24 THAT IF YOU ARE EVIL, YOU GET EVILER.   AND IF YOU ARE

25 CRUEL, YOU GET CRUELER.  THE WHOLE POINT IS DR. PRESTON

Case 6:17-cv-00037-RDP-RRA Document 44 Filed 09/17/18 Page 67 of 86

1   SAID HE HAS NO IDEA WHETHER OR NOT THIS PERSON CAN EVER BE

2   REHABILITATED, HE JUST DOES NOT KNOW.  I DON'T KNOW; THE

3   COURT DOESN'T KNOW.  AND IF HE SAYS OUT OF HIS OWN MOUTH

4   THAT THE WAY THAT HE IS, IS THAT IF HE IS SAD HE GETS

5   SADDER, IF HE IS MAD, HE GETS MADDER, WELL, I SUGGEST TO

6   THE COURT THAT ALSO IF HE IS CRUEL, HE GETS CRUELER, AND

7   IF HE IS EVIL, HE GOT MORE EVIL.  AND IT WOULD BE

8   HORRENDOUS IF HE WAS EVER RELEASED FROM COURT AND DID

9   SOMETHING LIKE THIS TO A CHILD AGAIN.

10         THE COURT:  ALL RIGHT.

11         MS. BURRELL:  SO TO ANSWER YOUR QUESTION,

12   WE DON'T KNOW WHETHER HE CAN BE REHABILITATED.

13         THE COURT:  LET ME ASK YOU THE SECOND

14   QUESTION THEN.  MR. REID SUGGESTS THAT THIS IS THE

15   ULTIMATE SANCTION SHORT OF THE DEATH PENALTY THAT THIS

16   COURT COULD ADMINISTER AND SAYS THAT THIS SHOULD NOT,

17   THESE CRIMES, AS BAD AS THEY ARE, SHOULD NOT BE VIEWED ON

18   THE SAME PLANE AS MURDER, FOR EXAMPLE, INTENTIONAL MURDER.

19   WHAT'S THE GOVERNMENT'S RESPONSE TO THOSE ARGUMENTS.

20         MS. BURRELL:  MY RESPONSIBILITY TO THAT ARGUMENT

21   IS CONGRESS HAS SAID THAT THEY ARE, THAT SOME CRIMES

22   AGAINST CHILDREN ARE SO HORRENDOUS THAT THEY OUGHT TO CALL

23   FOR A LIFE SENTENCE.  AND I QUOTED A COUPLE OF CASES OUT

24   OF THIS COURTHOUSE THAT THE DEFENDANTS HAVE GOTTEN THE

25   EQUIVALENT TO A LIFE SENTENCE.

Case 6:12-cv-00037-RDP-PKR Document 4-4 Filed 09/17/13 Page 68 of 86

1   AND I ALSO NUMEROUS TIMES QUOTED THE HIRSCH CASE,

2   WHICH WAS A CASE THAT HAPPENED DOWN IN SOUTH FLORIDA.

3   THAT DEFENDANT ALSO GOT A LIFE SENTENCE FOR THINGS THAT HE

4   HAD DONE TO CHILDREN.  HE HAD NOT TORTURED CHILDREN.  ONE

5   OF THE CASES THAT I CITED THAT JUDGE HOPKINS SENTENCED TO,

6   THAT MAN HAD NOT TORTURED CHILDREN.

7   YOU HAVE SEEN THE VIDEOTAPE, YOUR HONOR.  IT'S --

8   WORDS CAN'T DESCRIBE WHAT YOU SEE IN THAT VIDEOTAPE.  AND

9   SHORT OF KILLING THAT CHILD, I CAN'T THINK OF ANYTHING

10  THAT HE COULD HAVE DONE THAT WAS WORSE TO HIM.  AND AS A

11  MATTER OF FACT, THERE ARE TIMES IN THAT VIDEOTAPE WHERE

12  THAT CHILD IS DOING EVERYTHING HE CAN TO MENTALLY GET OUT

13  OF THE SITUATION.  I DON'T KNOW IF THE COURT HEARD IT BUT

14  AT SOME POINT THAT LITTLE BOY, WHEN HE IS BEING TORTURED,

15  SAYS HE WANTS TO GO TO SLEEP.  WELL, HE WANTS TO GO TO

16  SLEEP BECAUSE HE IS TRYING TO DO EVERYTHING HE CAN TO GET

17  AWAY FROM WHAT'S HAPPENING TO HIM AND THE TORTURE THAT'S

18  HAPPENING TO HIM.  AND SO, JUDGE, SHORT OF KILLING THIS

19  CHILD, I DON'T KNOW WHAT HE COULD HAVE DONE THAT WAS WORSE

20  TO HIM.

21  I THINK CERTAINLY IT CALLS FOR A LIFE SENTENCE.

22  AND THERE HAVE BEEN CASES IN THIS COURTHOUSE AND ALL

23  AROUND THE ELEVENTH CIRCUIT THAT WERE NOT NEAR THIS

24  HORRENDOUS THAT HAVE GOTTEN LIFE SENTENCES.

25  THE COURT:  ALL RIGHT.  ANYTHING FURTHER FROM THE

1  GOVERNMENT?

2          MS. BURRELL:  OH, NO, THANK YOU, YOUR HONOR.

3              THE COURT:  MR. REID, YOU WANT TO HAVE LAST

4  WORD ON THAT?

5          MR. REID:  I WOULD, YOUR HONOR.  TO SAY THAT THIS

6  IS, THE ONLY THING WORSE WOULD BE TO KILL THEM I THINK IS

7  OVERLOOKING THE FACT THAT THEY WEREN'T SEXUALLY ASSAULTED.

8          ALSO, YOUR HONOR, I THINK THAT REHABILITATION

9  DOES FIGURE INTO THIS EQUATION.  NO ONE KNOWS, BUT IF A

10  LIFE SENTENCE IS IMPOSED, WE KNOW THE ANSWER TO THAT.

11  THERE IS NO CHANCE FOR REHABILITATION THEN.  YOUR HONOR,

12  TO LOOK --

13          THE COURT:  WHAT DO YOU MAKE OF THE GOVERNMENT'S

14  ARGUMENT THAT THE ONLY WAY TO INSURE THAT CHILDREN ARE

15  PROTECTED FROM THIS DEFENDANT WOULD BE EQUIVALENT TO A

16  LIFE SENTENCE?

17              MR. REID:  I THINK THERE ARE OTHER MEASURES

18  THAT COULD BE IMPOSED.

19              THE COURT:  WHAT ARE THEY?

20              MR. REID:  LIFETIME SUPERVISED RELEASE,

21  NEVER TO HAVE CONTACT WITH A CHILD UNDER THE AGE OF 18

22  AGAIN.  THERE ARE ALL SORTS OF FACTORS.  THE REGISTRATION

23  PROGRAMS INCREASE EVERY YEAR.  THE REGISTRATION

24  REQUIREMENTS INCREASE EVERY YEAR.  THERE ARE NUMEROUS

25  OTHER THINGS THAT CAN BE IN PLACE TO INSURE THIS

1   INDIVIDUAL DOESN'T COME IN CONTACT WITH CHILDREN.

2          YOUR HONOR, ALSO IN COMPARING THIS CASE TO OTHER

3   CASES, EVERY CASE HAS TO STAND ON ITS OWN MERITS.  TO SAY

4   THAT THIS CASE IS AN A, B OR C TYPE CASE, I HAVE NEVER HAD

5   A CASE LIKE THIS BEFORE WITH THESE EXACT SET OF

6   CIRCUMSTANCES, THE EXACT SET OF FACTS.  AND YOUR HONOR, I

7   THINK IT BEHOOVES THE COURT TO LOOK AT EACH DEFENDANT ON

8   THEIR INDIVIDUAL MERITS AND THEIR ACTIONS AND THE

9   CIRCUMSTANCES OF THEIR CASE ALONG WITH THE LAW.  AND TO

10  SPEAK AS TO WHAT CONGRESS HAS DECIDED, CONGRESS SETS

11  STATUTORY MAXIMUMS AND MINIMUMS IN THIS CASE.  AND IF THEY

12  HAD INTENDED THE MAXIMUM TO BE LIFE, THEY HAD THE ABILITY

13  TO DO THAT, BUT THEY MADE IT THIRTY YEARS.

14         THE COURT:  WELL, IN THE SENTENCING GUIDELINES

15  THEY HAVE TOLD US THEY INTENDED A LIFE SENTENCE IN THIS

16  CASE.  THE STATUTORY MAXIMUMS OVERRULE THAT THOUGH,

17  RIGHT?

18         MR. REID:  THAT'S -- IN MY UNDERSTANDING OF

19  THE BOOKER CASE THAT THE GUIDELINES ARE ADVISORY --

20         THE COURT:  HASN'T CONGRESS ALSO INDICATED

21  THEY PREFER CONSECUTIVE SENTENCES HERE?  THAT IT PREFERS

22  CONSECUTIVE SENTENCES HERE, ISN'T THAT WHAT THEY EXPECT?

23  DOESN'T MEAN THE JUDGES DON'T HAVE THE DISCRETION IN SOME

24  INSTANCES TO DO DIFFERENTLY.  BUT IF WE ARE LOOKING AT

25  CONGRESSIONAL INTENT, CONGRESSIONAL INTENT IS CONSECUTIVE

Case 6:17-cv-00637-RDP-NHE Document 44 Filed 09/17/18 Page 71 of 87
Case 6:17-cv-00637-RDP-PRA Document 40 Filed 09/17/18 Page 71 of 86

71

1    SENTENCES UNDER THESE FACTS, CORRECT?

2         MR. REID:  I COULDN'T SPEAK TO THAT DIRECTLY

3    UNDER THIS SET OF FACTS.

4              THE COURT:  THAT'S WHAT THE STATUTE

5    PROVIDES FOR, RIGHT?

6              MR. REID:  THE STATUTE STANDS ON ITS OWN

7    MERIT, YOUR HONOR.  I WOULD SAY THEY HAVE SET PARAMETERS.

8    THE COURT CAN FOLLOW THOSE AND IS REQUIRED TO FOLLOW

9    THOSE.  BUT WHAT I AM SAYING, YOUR HONOR, IS THERE IS A

10   POSSIBILITY THAT THIS DEFENDANT CAN BE REHABILITATED.  WE

11   ARE ASKING THE COURT TO CONSIDER THAT POSSIBILITY.  WE ARE

12   ASKING THE COURT TO VARY FROM THE SENTENCE AND DEPART

13   DOWNWARD FROM THE ADVISORY GUIDELINES.

14             THE COURT:  MS. BURRELL, I HAVE GOT A

15   QUESTION OF YOU.  DID YOUR INVESTIGATION OR PROSECUTION OF

16   THIS CASE EVER INDICATE EXACTLY WHAT THE WATER WAS?  I SAW

17   ON THE VIDEOS WHERE THERE WERE SEVERAL THREATS, "I AM

18   GOING TO TAKE YOU TO THE WATER."  ANY INDICATION WHAT THAT

19   WAS?

20        MS. BURRELL:  NO, I AM NOT SURE, YOUR HONOR.

21        YOUR HONOR, CAN I MAKE ONE MORE COMMENT ABOUT THE

22   FACT THAT THESE CHILDREN WERE NEVER SEXUALLY ASSAULTED?

23   BECAUSE I WANT TO MAKE THIS CLEAR ON THE RECORD.

24        THE COURT:  YOU MAY.

25        MS. BURRELL:  ALTHOUGH THE GOVERNMENT CANNOT

1  PROVE PIERRE FALGOUT LAID HANDS ON THESE CHILDREN AND

2  SEXUALLY ASSAULTED THEM OR SEXUALLY ASSAULTED THEM WITH

3  HIS SEX ORGAN OR WHATEVER, I WANT THE COURT TO REMEMBER

4  AND I WANT TO MAKE IT CLEAR ON THE RECORD, IMAGES

5  THIRTEEN, FOURTEEN AND FIFTEEN, FIRST OF ALL, THE

6  GOVERNMENT ARGUES THAT ALL OF THESE EXHIBITS ARE SEXUAL

7  ABUSE.  BUT I WANT THE COURT TO REMEMBER IMAGES THIRTEEN,

8  FOURTEEN AND FIFTEEN.

9          THE COURT:  YES.

10          MS. BURRELL:  THOSE CHILDREN ARE BEING

11  SEXUALLY ASSAULTED.  AND I WOULD SUBMIT TO THE COURT THAT

12  THOSE KIDS, ANYBODY IN THIS COURTROOM THAT'S GOT CHILDREN

13  ARE GOING TO KNOW THAT THOSE KIDS DID NOT SET UP THAT

14  SCENE.

15          THE COURT:  FOR THE RECORD, THIRTEEN, FOURTEEN

16  AND FIFTEEN ARE PHOTOGRAPHS OF ONE CHILD ENGAGING IN

17  SEXUAL CONDUCT WITH ANOTHER CHILD.

18          MS. BURRELL:  WITH THE ONE CHILD'S DIAPER

19  PULLED DOWN ABOUT MID-THIGH.

20          THE COURT:  RIGHT.  ALL RIGHT.  WE ARE GOING TO

21  TAKE ABOUT A FIVE OR TEN MINUTE BREAK AND I WILL COME

22  BACK.

23          BEFORE I DO THAT -- RESTITUTION.  IS THERE SOME

24  INFORMATION OR EVIDENCE, ANYTHING HERE, ABOUT RESTITUTION

25  FROM THE RESPECTIVE SIDES?  I HAVE GOTTEN SOME INFORMATION

Case 6:12-cv-00037-RDP-PNE   Document 64   Filed 09/17/10   Page 73 of 87
Case 6:07-cv-00037-RDP-PRA   Document 46   Filed 09/17/08   Page 73 of 86

73

1   FROM PROBATION ABOUT COUNSELING FOR J.M. NUMBER TWO.

2                MS. BURRELL:  IS THAT THE MEMO DATED APRIL

3   18, 2008, YOUR HONOR?

4                THE COURT:  YES.

5        MS. BURRELL:  THAT'S ALL THE GOVERNMENT'S GOING

6   TO HAVE.

7                THE COURT:  IS THAT THE $1,500 FOR

8   COUNSELING?

9        MS. BURRELL:  $1,500 --

10               THE COURT:  $600 FOR LOST WAGES?

11               MS. BURRELL:  $600 FOR LOST WAGES, AND THEN

12   THE OTHER CHILD IS GETTING FREE COUNSELING.  SO, YES,

13   THAT'S CORRECT, YOUR HONOR.

14               THE COURT:  BUT THE GOVERNMENT AGREED WITH

15   THE PROBATION OFFICE THAT THE RELOCATION EXPENSES ARE

16   EXCLUDABLE FROM RESTITUTION.

17       MS. BURRELL:  I DO AGREE WITH THAT, YOUR HONOR.

18       THE COURT:  SO WHAT WE ARE LOOKING AT IS AN

19   AMOUNT OF RESTITUTION, $2,100.

20       MS. BURRELL:  RIGHT.

21       THE COURT:  ALL RIGHT.  DEFENDANT WANT TO BE

22   HEARD ON THAT OR IS THAT ACCEPTABLE?

23       MR. REID:  NO ARGUMENT IN THAT, YOUR HONOR.

24       THE COURT:  ALL RIGHT.  WE WILL BE IN RECESS FOR

25   A FEW MINUTES.

Case 6:12-cv-00037-RDP-JHE   Document 44   Filed 09/17/10   Page 74 of 87
Case 6:17-cv-00037-RDP-PRA   Document 40   Filed 09/17/08   Page 74 of 86

74

```
1              (BRIEF RECESS)
2         THE CLERK:  REMAIN SEATED, COME TO ORDER, PLEASE.
3         THE COURT:  ALL RIGHT.  THE COURT HAS CONDUCTED A
4    HEARING IN THIS MATTER AND IS PREPARED TO GO FORWARD WITH
5    FINDINGS AND A SENTENCE.  I ASK THE DEFENDANT'S COUNSEL TO
6    PLEASE STAND.
7         WE HAVE HAD PRESENTATION OF EVIDENCE.  I HAVE
8    REVIEWED, IN PARTICULAR, THE PHOTOGRAPHIC IMAGES AND THE
9    VIDEO THAT WAS PRESENTED BY THE GOVERNMENT IN EVIDENCE.
10   TO SAY THAT THE VIDEO WAS SHOCKING WOULD BE AN
11   UNDERSTATEMENT.  THE EVIDENCE PRESENTED TO THE COURT SHOWS
12   THE DEFENDANT ENGAGED IN MALICIOUS, SADISTIC AND EXTREME
13   CONDUCT TOWARD FOUR DIFFERENT CHILDREN THAT INVOLVE SEXUAL
14   PREDATION, ABUSE AND EXPLOITATION.  THE VIDEO SHOWED JUST
15   A COMPLETE LACK OF ANY CIVILITY, INCLUDING BUT NOT LIMITED
16   TO OBVIOUSLY VIDEOTAPING A CHILD NAKED WHILE HE WAS UNDER
17   THE INFLUENCE OF SOME CONTROLLED SUBSTANCE.  AND I MAKE
18   THAT CONCLUSION BASED UPON THE BEHAVIOR OF THE CHILD IN
19   THE VIDEO, HIS PUPILS BEING DILATED AND BEING IN OBVIOUS
20   DISTRESS.  THE DEFENDANT DIRECTING HIM TO STAND UP AND
21   THREATENING HIM, WHEN HE DID NOT STAND UP OR FELL DOWN,
22   AND THREATENING TO TAKE HIM OUTSIDE TO THE WATER -- WHICH
23   I HAVE NO IDEA WHAT THAT WAS BUT IT WAS VERY OBVIOUS FROM
24   THE CHILD'S REACTION THAT THAT WAS SOMETHING THAT
25   INSTILLED GREAT FEAR IN THE CHILD.
```

Case 6:17-cv-00037-RDP-PRR Document 44 Filed 09/17/18 Page 75 of 87
Case 6:17-cv-00037-RDP-PRR Document 44 Filed 09/17/18 Page 75 of 86

75

1          IN THE SECOND CLIP, THE CHILD IS REQUIRED TO WEAR

2   TWO DIAPERS THAT WERE OBVIOUSLY FECES STAINED, IF NOT

3   LOADED, OVER THEIR HEAD, TAPED OVER HIS HEAD.  AND AGAIN,

4   HE WAS DIRECTED THROUGH KIND OF A MOCK EXHIBITION OF BEING

5   REQUIRED TO TAKE IT, FALLING DOWN.  IN THE FIRST CLIP, THE

6   CHILD FELL DOWN OVER TEN TIMES.  IN THE SECOND CLIP, THE

7   CHILD FELL DOWN NEARLY TEN TIMES.  THREE DIFFERENT TIMES,

8   THE DEFENDANT REFERRED TO HIM AS A MOTHER FUCKER.  AND, AT

9   ONE POINT, CARRIED HIM OUT, PRESUMABLY TO GO TO THE WATER,

10  BECAUSE WHEN HE RETURNED YOU COULD HEAR A HAIR DRYER GOING

11  IN THE BACKGROUND AND TELLING HIM TO STAY STILL.  THERE IS

12  ABOUT A TEN MINUTE GAP IN THE VIDEO AT THAT POINT WHILE

13  THE CHILD WAS OUT BUT WAS RETURNED BY THE DEFENDANT.

14          THE CHILD WAS SCREAMING AND CRYING DURING IT,

15  DURING THESE CLIPS.  ASKED TO GO TO THE BATHROOM AND

16  WASN'T ALLOWED TO BUT WAS THREATENED IF HE WENT TO THE

17  BATHROOM ON THE DEFENDANT'S FLOOR, FELL AND HIT HIS HEAD

18  ON A DOOR WAY, WAS SCREAMED AT REPEATEDLY AND THREATENED

19  REPEATEDLY.  I SAY THIS JUST SO THERE WILL BE SOME RECORD

20  EVIDENCE OF WHAT THE COURT VIEWED IN THE VIDEO.  THE VIDEO

21  SPEAKS FOR ITSELF.  I CAN'T EVEN DESCRIBE IT.

22          I NOTE ALSO THAT THESE OFFENSES WERE ENGAGED IN

23  BY THE DEFENDANT INVOLVING EXTRAORDINARILY VULNERABLE

24  VICTIMS.  THESE ARE ALL CHILDREN OF A YOUNG AGE WHO

25  OBVIOUSLY COULDN'T KNOW WHAT WAS GOING ON EXACTLY BUT KNEW

1  THAT THEY WERE AT LEAST BASED UPON J.M. NUMBER ONE'S

2  REACTION IN THE VIDEO, UNDERSTOOD THAT THERE WAS GREAT

3  FEAR.  AND I ALSO UNDERSTAND THERE WILL BE DIRE EFFECTS

4  THAT THE DEFENDANT'S ABUSE WILL CAUSE.

5         THE DEFENDANT SAYS NOW HE IS OUT OF THEIR LIVES;

6  THAT'S NOT THE CASE.  YOU WILL NEVER BE OUT OF THEIR

7  LIVES.  YOU MAY NOT BE PRESENT, BUT YOU WILL BE IN THEIR

8  LIVES.  THERE IS NOTHING WE CAN DO ABOUT THAT AT THIS

9  POINT OTHER THAN THROUGH COUNSELING.  EVEN THE DEFENDANT'S

10 EXPERT ADMITTED THESE WERE SADISTIC ACTS.  AND ALTHOUGH

11 THE DEFENDANT HIMSELF REPORTED VARIOUS DISINTEREST IN

12 SEXUAL EXPLOITATION OF CHILDREN AND BONDAGE AND OTHER

13 THINGS, THE RECORD EVIDENCE CERTAINLY SCREAMS A DIFFERENT

14 INDICATION.

15        HAVING SAID ALL THAT, THAT'S HOW I ANALYZE THE

16 NATURE AND CIRCUMSTANCES OF THE OFFENSE.  I ALSO HAVE TO

17 TAKE INTO ACCOUNT THE HISTORY AND CHARACTERISTICS OF THE

18 DEFENDANT.  I WANT TO COMMEND MR. REID FOR HIS

19 REPRESENTATION OF HIS CLIENT.  HE HAS DONE WHAT I THINK TO

20 BE A VERY GOOD JOB OF TRYING TO POINT OUT, POINT TO THE

21 COURT TO THE FACT THAT THE DEFENDANT FOR SOME THIRTY-PLUS

22 YEARS DID NOT EXHIBIT ANY OF THESE TENDENCIES AND, IN

23 FACT, THE INDICATION IS THAT HE HAD A FAIRLY NORMAL

24 CHILDHOOD AND EARLY ADULTHOOD, GAINFULLY EMPLOYED, DOING

25 WELL AT WORK.  AT LEAST TO A CERTAIN POINT, DOING WELL IN

1  FAMILY RELATIONSHIPS AND OTHER RELATIONSHIPS.  AND THE

2  COURT HAS TO TAKE THAT INTO ACCOUNT AND HAS.  BUT THIS IS

3  A CASE IN WHICH THE COURT CAN'T ALLOW THE HISTORY AND

4  CIRCUMSTANCES OF THE DEFENDANT TO CAST A SHADOW THAT

5  DISGUISES THE NATURE AND CIRCUMSTANCES OF THE DEFENSE.

6          I HAVE ALSO TAKEN INTO ACCOUNT MR. REID'S

7  ARGUMENTS THAT WE OUGHT TO SEARCH FOR A SENTENCE THAT IS

8  SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE

9  STATUTORY PURPOSES OF SENTENCING.  I THINK I HAVE DONE

10 THAT.  I DO THINK THAT THE SENTENCE I AM GOING TO IMPOSE

11 WILL ACHIEVE THE STATUTORY PURPOSES OF SENTENCING AND WILL

12 PROVIDE FOR, WILL REFLECT THE SERIOUSNESS EVENTS PROMOTE

13 RESPECT FOR THE LAW AND PROVIDE JUST PUNISHMENT.

14          I THINK IT'S ALSO IMPORTANT IN THIS CASE TO

15 UNDERSTAND THAT MY DUTY UNDER APPLYING THESE STATUTORY

16 FACTORS IS TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF

17 THE DEFENDANT.  I AM NOT A PSYCHOLOGIST, I AM NOT A

18 PSYCHIATRIST, I AM JUST A JUDGE.  IT SEEMS TO ME THOUGH

19 THAT THE ARGUMENTS THAT MR. REID MADE THAT THERE WAS NO

20 SEXUAL EVIDENCE OF SEXUAL MOLESTATION OF THE CHILD ARE

21 CORRECT AS FAR AS THEY GO, BUT THEY FAIL TO TAKE INTO

22 ACCOUNT THIS THERE WERE SADISTIC ACTIONS TOWARD THE CHILD.

23 AT SOME POINT, A SEX OFFENDER, AND THERE IS NO QUESTION

24 THESE WERE SEX OFFENSES, BUT AT SOME POINT A SEX OFFENDER

25 WHO IS MOTIVATED PURELY BY PRURIENT INTERESTS WILL HAVE

THE DESIRE TO OFFEND, BE DIMINISHED BY DIMINISHED SEX
DRIVE.  AT LEAST THAT'S WHAT THE STUDIES I HAVE SEEN AND
THINGS THAT HAVE BEEN SUGGESTED TO ME IN PRIOR CASES WOULD
SUGGEST.  BUT WHEN IT COMES TO SADISTIC CONDUCT ENGAGED IN
TOWARDS CHILDREN, OF A SEXUAL NATURE, THAT DOESN'T GO
AWAY.  THAT WILL STILL BE THERE IN ADVANCED AGE.

            I THINK IT'S IMPORTANT THAT WE PROTECT THE PUBLIC
FROM FURTHER CRIMES OF THE DEFENDANT FOR THAT AND OTHER
REASONS.  I THINK THE CRIMES OF THIS DEFENDANT THAT THE
COURT HAS WITNESSED THROUGH THE EVIDENCE IN THIS CASE
CERTAINLY SUGGESTS OTHER REASONS WHY THAT'S AN APPROPRIATE
FACTOR TO CONSIDER, BUT THAT'S ONE THAT COMES TO MIND,
TOO.

            I AM AWARE THAT MR. REID'S RIGHT, THAT EACH CASE
STAND ON ITS OWN MERITS AND EACH DEFENDANT STANDS ON HIS
OR HER OWN MERITS.  AND SOMETIMES IT'S IMPORTANT TO
CONSIDER UNWARRANTED SENTENCING DISPARITIES IN THIS
COURTROOM AND OTHER PLACES.  I AM CONVINCED, HAVING LIVED
THROUGH THIS CASE NOW FOR SOME TIME, THAT THIS IS, IF NOT
THE WORST ONE THAT'S EVER COME TO THIS COURTHOUSE, IT'S A
COMPETITOR FOR THAT DUBIOUS HONOR.  FOR THOSE REASONS, THE
COURT BELIEVES THAT A SENTENCE AT THE STATUTORY MAXIMUMS
IS APPROPRIATE.

            THE COURT IS GOING TO COMMIT THE DEFENDANT TO THE
CUSTODY OF THE BUREAU OF PRISONS TO BE IMPRISONED FOR A

1   TERM OF 360 MONTHS AS TO COUNTS 1 THROUGH 30, COUNT 43 AND

2   COUNT 44, SEPARATELY AND WITH EACH COUNT TO RUN

3   CONSECUTIVELY TO EACH OTHER.  THAT WILL BE A TOTAL

4   SENTENCE OF 11,520 MONTHS OR 960 YEARS AS CALLED FOR IN

5   THE PRESENTENCE INVESTIGATION REPORT.

6           I THINK THE PROBATION OFFICE GOT IT RIGHT IN HOW

7   IT ANALYZED THIS CASE.  I AM GOING TO DISMISS ON THE

8   GOVERNMENT'S MOTION COUNTS 31 THROUGH 42 TO THE EXTENT

9   THAT IS ALREADY REFLECTED IN THE RECORD.  I UNDERSTAND

10  THAT I HAVE THE DISCRETION AND AUTHORITY UNDER BOOKER AND

11  IT'S PROGENY TO VARY IN THIS SENTENCE, AND I KNOW THE

12  DEFENDANT'S ASKED ME TO VARY.  I JUST DON'T THINK THIS IS

13  A VARIANCE CASE.  I THINK THE SENTENCE JUST IMPOSED IS A

14  REASONABLE ONE UNDER THE GUIDELINES AND, AGAIN, I DO

15  BELIEVE IT IS SUFFICIENT AND NOT GREATER THAN NECESSARY TO

16  ACHIEVE THE STATUTORY PURPOSES OF SENTENCING.  I REALIZE

17  THOSE MAY SOUND AS HOLLOW WORDS TO A DEFENDANT AND HIS

18  COUNSEL BUT I THINK THIS IS A LIFE SENTENCE CASE.  AND I

19  UNDERSTAND THAT THE IMPOSITION OF IT CARRIES WITH IT

20  EFFECTIVELY A LIFE SENTENCE FOR THE DEFENDANT.

21          I AM GOING TO ORDER THE DEFENDANT TO PAY

22  RESTITUTION IN THE AMOUNT OF $2,100 WITH INTEREST TO THE

23  VICTIMS IN THE AMOUNTS INDICATED BY THE GOVERNMENT IN THE

24  SENTENCING HEARING.

25          THE COURT HAS CONSIDERED THE INFORMATION IN THE

Case 6:07-cr-00437-RDP-PMP   Document 46   Filed 09/17/08   Page 80 of 86

1    PRESENCE REPORT CONCERNING DEFENDANT'S FINANCIAL

2    CIRCUMSTANCES AND RELIED UPON THAT INFORMATION IN FINDING

3    THAT I AM GOING TO ORDER THAT DURING THE PERIOD OF

4    INCARCERATION THE DEFENDANT MAKE PAYMENTS OF 25 DOLLARS

5    PER MONTH.  AND TO THE EXTENT THERE IS ANY RELEASE FROM

6    IMPRISONMENT, ANY REMAINING BALANCE SHALL BE PAID IN

7    MONTHLY PAYMENTS DURING THE PERIOD OF SUPERVISED RELEASE

8    IN ACCORDANCE WITH THE FINANCIAL GUIDELINES PREVIOUSLY

9    APPROVED BY THE COURT FOR USE IN THIS DISTRICT AND

10   ADMINISTERED BY THE PROBATION OFFICE.

11          I AM NOT GOING TO IMPOSE A FINE.  I DO NOT

12   BELIEVE THE DEFENDANT HAS THE ABILITY TO PAY A FINE.  HE

13   IS ORDERED TO PAY THE UNITED STATES A SPECIAL ASSESSMENT

14   FEE OF $3,200 WHICH IS DUE IMMEDIATELY.  THAT REFLECTS A

15   $100 ASSESSMENT FOR EACH FELONY COUNT TO WHICH HE HAS PLED

16   GUILTY AND BEEN SENTENCED.

17          UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT

18   SHALL BE PLACED ON SUPERVISED RELEASE FOR A PERIOD OF

19   LIFE.  IF HE IS RELEASED ON SUPERVISED RELEASE, HE SHALL

20   COMPLY WITH THE STANDARD CONDITIONS OF SUPERVISED RELEASE

21   OF RECORD IN THIS COURT AND THE FOLLOWING SPECIAL

22   CONDITIONS:

23          FIRST, DUE TO THE INFORMATION CONTAINED IN THE

24   MENTAL HEALTH SECTION OF THE PRESENCE REPORT, THE

25   DEFENDANT SHALL PARTICIPATE IN A MENTAL HEALTH PROGRAM

1  UNDER THE ADMINISTRATIVE SUPERVISION OF THE PROBATION

2  OFFICER AND HE SHALL CONTRIBUTE TO THE COST OF MENTAL

3  HEALTH TREATMENT UNLESS THE PROBATION OFFICER DETERMINES

4  HE DOES NOT HAVE THE ABILITY TO DO SO.

5       SECOND, DUE TO THE DEFENDANT'S HISTORY OF

6  SUBSTANCE ABUSE, HE SHALL PARTICIPATE UNDER THE

7  ADMINISTRATIVE SUPERVISION OF THE PROBATION OFFICER IN THE

8  DRUG AND ALCOHOL INTENSIVE COUNSELING AND AFTERCARE

9  SERVICE PROGRAM CONDUCTED BY THE PROBATION OFFICE OR ANY

10  COMPARABLE PROGRAM CONDUCTED IN HIS DISTRICT OF

11  SUPERVISION.

12       THE FOLLOWING SPECIAL CONDITIONS ARE IMPOSED DUE

13  TO THE NATURE OF THE INCIDENT OFFENSES.  FIRST, THE

14  DEFENDANT SHALL PARTICIPATE UNDER THE ADMINISTRATIVE

15  SUPERVISION OF THE PROBATION OFFICER IN THE PROBATION

16  OFFICE'S COMPUTER RESTRICTION MONITORING PROGRAM OR

17  COMPARABLE PROGRAM IN THE DISTRICT OF SUPERVISION.

18       SECOND, HE SHALL NOT HAVE ANY UNSUPERVISED,

19  ONE-TO-ONE CONTACT WITH ANY CHILDREN UNDER THE AGE OF 18

20  OTHER THAN HIS OWN CHILDREN.

21       THIRD, HE SHOULD NOT ENGAGE IN YOU OCCUPATION,

22  EMPLOYMENT OR VOLUNTEER ACTIVITIES THAT WOULD PLACE HIM IN

23  POSITION OF TRUST WITH CHILDREN UNDER THE AGE OF 18.

24       FOURTH, PURSUANT TO THE ADAM WALSH CHILD

25  PROTECTION ACT OF 2006, THE DEFENDANT SHALL REGISTER AS A

1  SEX OFFENDER NOT LATER THAN THREE BUSINESS DAYS FROM

2  RELEASE.  IF PLACED ON SUPERVISED RELEASE FOR

3  SENTENCING –– IF PLACED ON PROBATION.  THE DEFENDANT SHALL

4  KEEP THE REGISTRATION CURRENT IN EACH JURISDICTION WHICH

5  HE RESIDES, IS EMPLOYED, OR IS A STUDENT, AND SHALL NOT,

6  LATER THAN THREE BUSINESS DAYS AFTER ANY CHANGE IN NAME,

7  RESIDENCE, EMPLOYMENT OR STUDENT STATUS APPEAR IN PERSON

8  OR IN AT LEAST ONE JURISDICTION WHICH THE DEFENDANT IS

9  REGISTERED INFORM THE JURISDICTION OF ALL CHANGES IN THE

10 INFORMATION.  FAILURE TO DO SO MAY NOT ONLY BE A VIOLATION

11 OF THIS CONDITION BUT ALSO MAY CONSTITUTE A SEPARATE

12 FEDERAL OFFENSE PUNISHABLE BY IMPRISONMENT UP TO TEN

13 YEARS.

14      THE DEFENDANT ALSO SHALL ALLOW THE PROBATION

15 OFFICER ACCESS TO ANY PHOTOGRAPHS AND/OR VIDEO RECORDINGS

16 THAT HE MAY POSSESS, AND HE BEING A FELON AND BEING

17 REQUIRED TO REGISTER UNDER THE SEX OFFENDER REGISTRATION

18 NOTIFICATION ACT SHALL SUBMIT HIS PERSON, PROPERTY, HOUSE,

19 RESIDENCE, VEHICLE, PAPERS, COMPUTER, OR OTHER ELECTRONIC

20 COMMUNICATION AS TO STORAGE DEVICES OR MEDIA AND EFFECTS

21 TO SEARCH AT ANY TIME WITH OR ABOUT A WARRANT BY ANY LAW

22 ENFORCEMENT OR PROBATION OFFICER WITH REASONABLE SUSPICION

23 CONCERNING A VIOLATION OF A CONDITION OF SUPERVISED

24 RELEASE OR UNLAWFUL CONDUCT BY THE PERSON AND BY ANY

25 PROBATION OFFICER IN THE LAWFUL DISCHARGE OF THAT

OFFICER'S SUPERVISION FUNCTIONS.

       FINALLY, DEFENDANT SHALL PARTICIPATE IN AN APPROVED MENTAL HEALTH TREATMENT PROGRAM SPECIALIZING IN SEX OFFENDER TREATMENT UNDER THE ADMINISTRATIVE SUPERVISION OF THE PROBATION OFFICE.  THIS PROGRAM MAY INCLUDE A PSYCHIATRIC SEXUAL EVALUATION, FAMILY GROUP AND/OR INDIVIDUAL COUNSELING AND PSYCHOLOGICAL AND CLINICAL POLYGRAPH TESTING.  THE RESULTS OF THE POLYGRAPH EXAMS MAY NOT BE USED AS EVIDENCE IN COURT FOR THE PURPOSE OF REVOCATION OF SUPERVISION BUT MAY BE CONSIDERED IN A HEARING TO MODIFY CONDITIONS OF RELEASE.

       AND WHILE PARTICIPATING IN TREATMENT, THE DEFENDANT SHALL ABIDE BY ALL RULES AND REQUIREMENTS OF THE PROGRAM, SHALL CONTRIBUTE TO THE COST OF TREATMENT AND POLYGRAPH TESTING UNLESS THE PROBATION OFFICER DETERMINES HE DOES NOT HAVE THE ABILITY TO DO SO.

       THIS AGAIN HAS BEEN A DIFFICULT CASE. MR. FALGOUT, A LOT OF TALK WAS MADE ABOUT WHETHER THERE WAS HOPE FOR YOU.  YOU ARE STILL -- YOU WILL BE INCARCERATED, BUT YOU STILL HAVE A FAMILY WHO LOVES YOU AND STANDS BEHIND YOU.  THAT IS A REASON FOR HOPE.  ALL RIGHT?  I THINK YOU HAVE FORFEITED YOUR RIGHT, BASED UPON WHAT YOU DID TO THESE CHILDREN, TO LIVE AS A FREE PERSON IN OUR SOCIETY FOR THE REST OF YOUR LIFE.  I DON'T BELIEVE THAT MEANS THERE IS NO HOPE FOR YOU.  DO YOU UNDERSTAND

Case 6:17-cv-09037-RDP-JHE Document 44 Filed 09/17/18 Page 84 of 87
Case 6:17-cv-09037-RDP-PRA Document 40 Filed 09/17/18 Page 84 of 86

84

```
 1   THAT?
 2              THE DEFENDANT:  YES, SIR.
 3                 THE COURT:  ALL RIGHT.  IS THERE ANY
 4   OBJECTION FROM ANY PARTY AS TO THE FINDINGS OF FACT, THE
 5   CALCULATIONS, THE SENTENCE, OR THE MANNER IN WHICH THE
 6   SENTENCE WAS PRONOUNCED OR IMPOSED?
 7              MS. BURRELL:  NONE FROM THE GOVERNMENT, YOUR
 8   HONOR.
 9              MR. REID:  NONE THAN THOSE ALREADY STATED, YOUR
10   HONOR.
11              THE COURT:  I UNDERSTAND THE DEFENDANT'S
12   RESERVING ITS RIGHT TO ARGUE THAT ON APPEAL THERE SHOULD
13   HAVE BEEN A VARIANCE.
14              MR. REID:  THAT'S RIGHT.
15                 THE COURT:  VERY WELL.  I WANT TO MAKE SURE
16   YOU UNDERSTAND THAT'S PRESERVED.  ALL RIGHT.  MR. FALGOUT,
17   YOU HAVE THE RIGHT TO APPEAL THE SENTENCE IMPOSED WITHIN
18   TEN DAYS IF YOU BELIEVE THE SENTENCE IS IN VIOLATION OF
19   THE LAW.  WITH FEW EXCEPTIONS, ANY NOTICE OF APPEAL MUST
20   BE FILED WITHIN TEN DAYS OF JUDGMENT BEING ENTERED IN YOUR
21   CASE.  IF YOU ARE UNABLE TO PAY THE COST OF AN APPEAL YOU
22   MAY APPLY FOR LEAVE TO APPEAL IN FORMA PAUPERIS AND FOR
23   THE APPOINTMENT OF COUNSEL.  IF YOU ARE ALLOWED BY THE
24   COURT TO PROCEED ON APPEAL IN FORMA PAUPERIS, UPON YOUR
25   REQUEST THE CLERK WILL ASSIST YOU IN PREPARING AND FILING
```

Case 6:12-cv-08037-RDP-JHE   Document 6-4   Filed 09/17/13   Page 85 of 87
Case 6:07-cr-00167-RDP-RRA   Document 46   Filed 09/17/08   Page 85 of 86

85

```
 1   A NOTICE OF APPEAL.

 2             DO YOU UNDERSTAND ALL THAT, SIR?

 3        THE DEFENDANT:  YES, SIR.

 4        THE COURT:  ALL RIGHT.  IS THERE ANYTHING FURTHER

 5   FROM THE GOVERNMENT?

 6        MS. BURRELL:  NO, THANK YOU, YOUR HONOR.

 7        THE COURT:  ANYTHING FURTHER FROM THE DEFENDANT?

 8        MR. REID:  NO, YOUR HONOR.

 9        THE COURT:  ALL RIGHT.  WE WILL BE ADJOURNED.

10             (COURT IN RECESS.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   *****************************************************
 2                 C E R T I F I C A T E
 3   *****************************************************
 4
 5   IN RE:  USA V. PIERRE ERNEST FALGOUT
 6
 7       I HEREBY CERTIFY THAT THE FOREGOING
 8   TRANSCRIPT IN THE ABOVE-STYLED CAUSE IS TRUE AND
 9   ACCURATE.
10
11
12   \S\LINDY M. FULLER, RMR, CRR      AUGUST 7, 2008
13   FEDERAL OFFICIAL COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 6:07-cv-00037-RDP-JHE   Document 44-1   Filed 09/17/08   Page 87 of 87

1  *********************************

2  *********************************

3

4

5  IN RE:  USA V. PIERRE ERNEST FALGOUT

6

7        I HEREBY CERTIFY THAT THE FOREGOING

8  TRANSCRIPT IN THE ABOVE-STYLED CAUSE IS TRUE AND

9  ACCURATE.

10

11                                          8-7-08

12  \S\LINDY M. FULLER, RMR, CRR      AUGUST 7, 2008

13  FEDERAL OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

86